hMICHAEL E. KIRBY, Judge.
The City of New Orleans appeals the portion of the November 20, 2002 trial court judgment ordering it to “cancel and erase from its rolls all taxes, health liens, housing liens, grass liens or liens of whatever nature or kind” as they relate to property located at 3701-03 Loyola Avenue.
This case involved an expropriation suit filed by the New Orleans Redevelopment Authority (“NORA”) against Renetta Ovide, divorced wife by first marriage of James Oliver Davis and wife by second marriage of/and James McDuffie, or their successions and heirs, if deceased; Cora D. Carter and N.P.H. Company, L.L.C. (“NPH”). The City of New Orleans was not a party to this expropriation proceeding, but monitored the proceedings after being served with a “Notice to Creditor” document.
NORA is an agency authorized by the Louisiana Legislature to acquire blighted properties in the City of New Orleans, through purchase, expropriation or otherwise, and to subsequently dispose of such property. NORA began its existence as the “Community Improvement Agency in and for the City of New | ^Orleans” (“CIA”) by virtue of Acts 1968, No. 170 (copy of the act attached as Appendix A). CIA’s name was changed by Acts 1994, 3rd Ex.Sess., No. 135 (copy of the act attached as Appendix B), effective July 7, 1994, to New Orleans Redevelopment Authority.[1] Acts 1972, No. 299 (copy of the act attached as Appendix C), Acts 1980, Nos. 571 and 572 (copies of the acts attached as Appendix D and Appendix E, respectively), Acts 1984, No. 155 (copy of the act attached as Appendix F), Acts 1995, No. 375 (copy of the act attached as Appendix G), and Acts 1997, No. 101 (copy of the act attached as Appendix H) amended Acts 1968, No. 170.[2]
NORA filed its petition for expropriation on June 27, 2002 against the above-named defendants after the Administrative Adjudication Bureau of New Orleans determined that the property located at 3701-03 Loyola Avenue was blighted, and authorized NORA to acquire the same. According to the petition, Renetta and James McDuffie and NPH are the last two links in the recorded chain of title for the subject property, and Ms. Carter subsequently purchased the property at a tax sale, by an act not yet recorded.
In NORA’s petition, it requested that a judgment of expropriation be rendered *398 and that the title to the property pass to NORA free and clear of all encumbrances, reserving to the creditors, if any, satisfaction of their claims, to the extent possible, from the amount fixed in the judgment and deposited in the trial 13court’s registry, according to their priority as established by law. Additionally, NORA requested that all liens of whatever nature or kind heretofore assessed and recorded against the property by the City of New Orleans’ Departments of Finance, Health, Housing and Parkway and Park Commission be cancelled and erased within thirty days of rendition of judgment of expropriation. The petition also requested that any such liens that were not recorded when the petition was filed be declared null, void, unenforceable and otherwise without effect, and that no such lien be subsequently assessed, levied or recorded against the property until NORA has disposed of the property and 270 days have elapsed thereafter.
On August 8, 2002, NORA filed in the trial court a “Notice to Creditor of Expropriation,” and asked the court to serve the City of New Orleans with a copy of that notice. This notice was served on the New Orleans’ City Attorney’s Office on August 12, 2002. In that notice, NORA stated that mortgage records indicated that those being served with this notice could have an inferior mortgage, lien, privilege or other encumbrance bearing against the property to be expropriated.
At the trial in this matter, it was revealed that the structure on the property at issue was demolished prior to the date that the expropriation petition was filed, and that this fact was previously unknown to NORA. The trial court rendered judgment on November 20, 2002 dismissing the expropriation petition, but ordering defendants NPH and Ms. Carter to reimburse NORA for costs incurred in the amount of $2,000.00. The trial court also ordered the City of New Orleans to cancel and erase from its rolls, all taxes, health liens, housing liens, grass liens or 14liens of whatever nature or kind so that the property at issue could be transferred free and clear of said encumbrances. The City filed a motion for new trial from that judgment, which was denied. The City now appeals.
On appeal, the City raises six assignments of error. In one of those assignments, the City argues that the trial court erred in rendering judgment against it because the City was not named as a party to the expropriation proceeding or served with citation. The City argues that the judgment against it is null and void under La. C.C.P. article 1201.
La. C.C.P. article 1201 states, in pertinent part:
A. Citation and service thereof are essential in all civil actions except summary and executory proceedings and divorce actions under Civil Code Article 102. Without them all proceedings are absolutely null.
B. The defendant may expressly waive citation and service thereof by any written waiver made part of the record.
Although the City was served with a “Notice to Creditor of Expropriation,” it was never made a party to the expropriation suit and was never served with citation. Due process requires that a judgment cannot be rendered against a party until that party has been joined in the suit and has been served with process. Ceco Corporation v. R & M Industries, Inc., 425 So.2d 709 (La.1982). Therefore, the portion of the judgment rendered against the City is invalid. See also, Krueger v. Tabor, 546 So.2d 1317 (La.App. 3 Cir. 1989); Gardner v. Normal Life, Inc., 542 So.2d 823 (La.App. 3 Cir.1989); Champagne v. Lee, 470 So.2d 378 (La.App. 5 Cir.1985).
*399 |sWe note that in the case of U.S. Fidelity and Guaranty Co. v. Hurley, 96-1421 (La.App. 4 Cir. 8/6/97), 698 So.2d 482, this Court affirmed a judgment against an insurance company that was not named as a party to the lawsuit or served with citation. In the Hurley case, counsel for the insurance company that was not named as a defendant appeared at trial on behalf of the insurer, stipulated as to insurance coverage and after rendition of judgment against it, filed a motion for new trial that made no jurisdictional challenge. The insurer first raised the issue of lack of citation and service of process in its appellate brief filed along with an exception of no right of action. This Court found that considering the totality of the circumstances, the insurance company’s actions constituted a general appearance to defend the suit at trial and a waiver of objection to lack of citation and service. Id. at p. 14, 698 So.2d at 489.
The instant case is distinguishable from the Hurley case. In the instant case, counsel for the City was present at trial and stated that it was appearing on behalf of the City in its capacity as a creditor. Counsel stated at trial that the City is owed taxes in the amount of $2,878.90, but that statement was in response to a question posed by the trial court. After judgment was rendered against it, the City filed a motion for new trial arguing that the trial court committed error in rendering a judgment against a nonparty to the action.
Although the City admittedly monitored the expropriation proceedings, its actions did not indicate that it considered itself to be a party to the action. Considering the totality of the circumstances, we find that the City’s actions did Rnot constitute a waiver of the requirement of citation and service. Because the City was never named as a party, was not served with citation and did not perform acts indicating that it considered itself to be a defendant in the lawsuit, the trial court erred in rendering judgment against the City ordering it to cancel and erase its taxes and liens on the property at issue.
Furthermore, the trial court dismissed NORA’s petition for expropriation of the encumbered property at issue. La. R.S. 19:11 states as follows:
Whenever any property encumbered with mortgages or privileges of any kind is expropriated pursuant to this part, the property passes to the person expropriating it free and clear of all encumbrances. Any amount awarded pursuant to the provisions of this part shall be paid into the court by which the expropriation is made and distributed to the mortgage and privileged creditors according to their priority.
Even if service and citation were not at issue, the trial court was without authority to order the cancellation of taxes and liens relating to the property because the expropriation petition was dismissed.
For these reasons, the portion of the trial court judgment ordering the City to “cancel and erase from its rolls all taxes, health liens, housing liens, grass liens or liens of whatever nature or kind” as they relate to property located at 3701-03 Loyola Avenue is reversed.[3] In light of our conclusion, we need not address the City’s remaining arguments.
REVERSED.
*400 APPENDIX A
ACT No. 170
Senate Bill No. 110. By: Messrs. Guste, Smither, Eagan, O’Keefe and Duplantier.
AN ACT
To authorize, by local option, the formulation of a program by the City of New Orleans for the utilization of appropriate private and public resources to eliminate and prevent the development or spread of slums; to provide decent, safe and sanitary dwellings for families of low income; to allow the creation and organization of a Community Improvement Agency; to allow the rehabilitation, clearance and redevelopment of slums and blighted areas in the City of New Orleans in accordance with community improvement plans or projects approved by the governing body of the City of New Orleans; to define the duties, liabilities, exemptions, authority and functions of such community improvement agency, including the acquisition of property by negotiation, gift or expropriation, the disposition of property by sale or lease, the issuance of bonds, borrowing of money and giving of security therefor and to allow bonds issued to be legal investments for banks and fiduciaries; to provide for notice and hearing; to authorize entering into agreements to secure Federal aid; to authorize public bodies to furnish funds, services, facilities and property in aid of Community improvement projects and related activities hereunder; and to provide that securities issued and properties while held by the community improvement agency shall be exempt from taxation.
Notice of intention to apply for the passage of this Act has been published and evidence of such publication exhibited to the legislature, both as provided by Section 6 of Article IV of the Constitution of Louisiana.
Be it enacted by the Legislature of Louisiana: Section 1. Short Title
This Act may be referred to as the “New Orleans Community Improvement Act.”
Section 2. Findings, Declaration of Necessity, and Purpose It is hereby found and declared that:
(a) There exists in the City of New Orleans, Louisiana, areas which have become slum and blighted because of the unsafe, unsanitary, inadequate or overcrowded condition of the structures therein, or because of inadequate planning of the area, or because of physically and/or functionally obsolete structures, or because of excessive dwelling unit density, or because of the lack of proper light and air and open space, or because of faulty street or lot design, or inadequate public utilities or community services, or because of the conversion to incompatible types of land usage;
(b) Such conditions or a combination of some or all of them have and will continue to result in making such areas economic and social liabilities imposing onerous municipal burdens which decrease the tax base and reduce tax revenues, harmful to the social and economic well-being of the municipality, depreciating property values therein, and thereby depreciating further the general community-wide values;
(c) The prevention and elimination of slums and blight areas and their causes is a matter of public policy and concern in order that the municipality shall not continue to be endangered by areas which are focal centers of economic and social retardation, and consume an excessive proportion of its revenues because of the extra services required for police, fire, accident and other forms of public protection, services and facilities;
*401 (d) The salvage and renewal of such areas, in accordance with sound and approved plans for their redevelopment, will promote the public health, safety, morals and welfare;
(e) Certain such areas or portions thereof may be susceptible of conservation or rehabilitation by voluntary action and through existing regulatory processes in such a manner that the conditions and evils hereinbefore enumerated may be eliminated, remedied and prevented; and that in certain areas blight and slum conditions are beyond remedy or reasonable control through regulatory processes and can not be effectively dealt with under existing law without additional aids herein allowed; and that such conditions often exist under circumstances in areas in which their assembly for purposes of clearance, replanning and redevelopment is impossible without the exercise of the power of expropriation;
(f) The powers conferred by this Act are for public uses, purposes and utility for which public money may be expended, and expropriation authority utilized as necessary and in the public’s interest and in conformity with the approved plans of the municipality. The provisions herein provided shall apply for residential, recreational, commercial, industrial or other purposes and otherwise encourage the provision of healthful homes, a decent living environment and adequate places of employment for the people in this municipality. Such purposes are hereby declared as a matter of legislative de- termination.
(g) It shall be the public policy that not less than 25 per- cent of the proposed new dwellings included in each of the proposed projects where the relocation of persons or families |sare required, excluding penal, cultural, industrial, recreational and medical projects, or parts thereof, shall be dwellings for families of low income.
Section 3. Workable Program
The City of New Orleans* Louisiana, for the purposes of this Act may formulate a workable program for community improvement for utilizing appropriate private and public resources to eliminate and prevent the development or spread of slums and urban blight, to encourage needed rehabilitation, and to provide for the redevelopment of slum or blighted areas or to undertake other feasible municipal activities as may be suitably employed to achieve the objectives of such workable program.
Section 4. Encouragement of Private Enterprise.
“The Community Improvement Agency in and for the City of New Orleans”, to the greatest extent it determines to be feasible in carrying out the provisions of this Act, shall afford maximum opportunity, consistent with the sound needs of the City of New Orleans as a whole, to the rehabilitation or redevelopment of the community improvement area by private enterprise. The agency shall give consideration to this objective in exercising its authority under this Act.
Section 5. Creation of a Community Improvement Agency by Local Option
(a) There is hereby created in and for the City of New Orleans a public body corporate and politic known as the “Community Improvement Agency in and for City of New Orleans.” The Agency shall not transact any business or exercise any powers conferred upon the Agency by this Act until and unless the local governing body has by resolution authorized the Agency to exercise its powers under this Act.
The governing body of the City of New Orleans, Louisiana, shall by resolution, at any time after the passage of this Act, call *402 a public hearing to determine the need to activate the “Community Improvement Agency.” Notice of such hearing shall be published at least ten days preceding the day on which the hearing is to be held, in a newspaper having a general circulation in the municipality. Upon the date fixed for said hearing to be held upon notice as provided herein, a full opportunity to be heard shall be granted to all residents and taxpayers of the municipality. If the governing body finds it to be in the public interest that an agency for the municipality, as authorized by this Act, be activated to exercise the authority herein provided, then the local governing body shall adopt a resolution so finding and declaring and shall cause notice of such resolution to be given to the Mayor of the municipality, who shall thereupon appoint, with the advice and consent of the local governing body and as set forth in Sub-section (b) of this Section, commissioners of “The Community Improvement Agency in and for the City of New Orleans.” A certificate signed by the Mayor of the municipality and the commissioners shall then be filed in the office of the Secretary of State and there remain of record setting forth that the local governing body made the aforesaid finding and declaration and that the Mayor of the municipality had appointed them as commissioners. Upon the filing of such certificate, the commissioners and their successors shall constitute “The Community Improvement Agency in and for the City of New Orleans,” which shall be a political corporation of the state and shall have all the power and authority as set forth in this act.
In any suit, action or proceeding involving the validity or enforcement of any contract or act of the agency, a copy of the certificate, duly certified by the Secretary of State, shall be admissible in evidence in any such suit, action or proceeding.
(b) Appointment and Qualification of Commissioners Upon the certification of a resolution declaring the need for an agency to operate,' as set forth in Sub-section (a) above, the Mayor of the City of New Orleans shall appoint as commissioners of the agency with the advice and consent of the City Council of the City of New Orleans, seven citizens who shall be qualified electors of the municipality, one from each councilmanic district of the City and two from the City at large, as follows:
The Mayor shall request each of the members of the Legislature from the City of New Orleans to submit to him one nominee for the position of Commissioner. This request shall be made in writing and shall be mailed to each Legislator at his last known address. The: Legislator shall have ten days from the date of the mailing of the request by the Mayor in which he may submit to the Mayor the name of a nominee. Within 20 days after the mailing of the request to the members of the Legislature, the Mayor- shall appoint from those nominees submitted by the members of the Legislature the seven Commissioners of the agency. The failure of any member of the Legislature to receive the written request from the Mayor or the failure of any Legislator to make a nomination within the time specified shall not affect the validity of the appointments subsequently made by the Mayor. Appointment of a commissioner at the expiration of the term of an appointed commissioner, or appointment of a commissioner to fill the unexpired term of a position vacated by a commissioner shall be made by the Mayor from a panel nominated by the Legislators following the same procedure as above set forth for the appointment of the first commissioners of the agency.
*403 A certificate of the appointment or reappointment of any commissioner shall be filed with the Clerk of the City Council and such certificate shall be conclusive evidence of the due and proper appointment of such commissioner.
(c) Tenure and Compensation of Commissioners
The members who are first appointed shall serve for terms as follows: one for one year, one for two years, one for three years, two for four years, and two for five years, respectively, 13from the date of their appointment as shall be specified at the time of their appointment. Thereafter the term of office shall be five years. A member shall hold office until his successor has been appointed and qualified. Vacancies for unexpired terms shall be promptly filled by appointment by the Mayor from a panel nominated by the Legislators following the same procedure as set forth above for the appointment of the first commissioners of the agency. A commissioner shall receive no compensation for his service, but he shall be entitled to out-of-pocket expenses, including traveling expenses, incurred in the discharge of his duties.
(d) Organization of Agency
The members of the agency shall initially and annually thereafter select from among themselves a chairman, a vicechair-man, and such other officers as the agency may determine. The agency may employ an executive director and other employees as it may require and shall determine their qualifications and compensation. The agency may engage or employ counsel and legal staff. Four commissioners of an agency shall constitute a quorum for its meetings.
Action may be taken by the agency upon a vote of a majority of the commissioners of the Agency unless in any case the bylaws shall require a lager number. Members of an agency or other officers shall not be liable personally on the bonds or other obligations of the agency and the rights of creditors shall be solely against such agency.
(e) Interest of Commissioner or Employees
No commissioner or employee of the agency shall acquire any interest, direct or indirect, in any community improvement project or in any property included or planned to be included in any community improvement area, or in any area which he may have reason to believe may be certified to be a community improvement area, nor shall he have any interest, direct or indirect, in any contract or proposed contract for materials or services to be furnished or used by an agency, or in any contract with a redeveloper or prospective redeveloper relating directly or indirectly to any community improvement project. The acquisition of any such interest in a community improvement project or in any such property or contract shall constitute misconduct in office. If any commissioner or employee of the agency shall already own or control any interest, direct or indirect, in any property to be included in any community improvement project under the jurisdiction of the agency, or has any such interest in any contract for material or services to be furnished or used in connection with any community improvement project, he shall disclose the same in writing to the agency and such disclosure shall be entered in writing upon the minute books of the agency. Failure to make such disclosure shall constitute misconduct in office. Any such commissioner shall refrain from discussion, or voting on any proposal in which he shall have an interest.
(f) Removal of Commissioner
*404 With the consent of the local governing body, the Mayor of the municipality, may remove a commissioner for inefficiency or neglect of duty or for misconduct in office, but only after the commissioner has been given a copy of the charges against him, made by the Mayor, and has had an opportunity to be heard in person or by counsel before the local governing body. In the event of the removal of any commissioner, the Mayor shall file in the office of the clerk a record of the proceedings, together with the charges made against the commissioner and the findings thereon.
(g) Annual Report.
The agency authorized to transact business and exercise powers under this Act shall file, with the local governing body, on or before March 31 of each year, a report of its activities for the preceding calendar year, which report shall include a complete financial statement setting forth its assets, liabilities, receipts and disbursements as of the end of such calendar year. At the time of filing the report, the agency shall publish in a newspaper of general circulation in the community, a notice to the effect that such report has been filed with the local governing body and that the report is available for inspection during business hours in the office of the Clerk of the Council and in the office of the Agency.
Section 6. Authority.
The agency shall have all the authority and power necessary or convenient to carry out and effectuate the purposes and provisions of the Act, including; without limiting the generality of the foregoing, the following authority which shall be in addition to others herein granted:
(a)To undertake and carry out community improvement projects and related activities in accordance with the city’s comprehensive plan within its area of operation; and to make and |10execute contracts and other instruments necessary or convenient to the exercise of its authority under this Act; and to disseminate slum clearance and community improvement information;
(b) To provide or to arrange or contract for the furnishing or repair by any person or agency, public or private, of services, privileges, works, streets, roads, public utilities or other facilities for or in connection ‘with a community improvement project, to install, construct, and reconstruct streets, utilities, parks, playgrounds, and other public improvements; and to agree to and fulfill any conditions that it may deem reasonable and appropriate attached to federal financial assistance and imposed pursuant to Federal law in the undertaking or carrying out of a community improvement project and related activities, and to dnclude in any contract let in connection with such a project and related activities, provisions to fulfill such of said conditions as it may deem reasonable and appropriate;
(c) Within its area of operation, to acquire by purchase, lease, option, gift, grant, bequest, devise, expropriation or otherwise, any real property (or personal property for its administrative purposes) together with any improvements thereon; to hold, improve, clear, or prepare for redevelopment any such property; to mortgage, pledge, hypothecate, or other- wise encumber or dispose of any real property; to insure or provide for the insurance of any real or personal property or operations of the municipality against any risks or hazards, including the power to pay premiums on any such insurance; and to enter into any contracts necessary to effectuate the purpose of this Act: provided, however, that no statutory provision with respect to the clearance, or disposition of property by public bodies shall restrict the *405 agency exercising powers thereunder, in the exercise of such functions with respect to a community improvement project and related activities, unless the legislature shall specifically so state;
(d) With the approval of the local governing body, after public hearing procedure as provided in Section 7(b):
Prior to approval of a community improvement plan, or approval of any modification of the plan, to acquire real property in a community improvement area, demolish and remove any structures on the property, and pay all costs related to the acquisition, demolition, or removal, including any administrative or relocation expenses; the local governing body may agree to assume the responsibility to bear any loss that may arise as the result of the exercise of authority under this subsection in the event -that the real property is not made a part of the community improvement plan or project;
(e) To invest any community improvement funds held in reserve or sinking funds or in any such funds not required for immediate disbursement, in property or securities in which public bodies may legally invest funds subject to their control; to redeem such bonds as have been issued pursuant to Section 10 of this Act at the redemption price established therein or to purchase such bonds at less than redemption price, all such bonds so redeemed, or purchased to be cancelled;
(f) To borrow money and to apply for and accept advances, loans, grants, contributions, and any other form of assistance from the federal government, the state, parish, or other public bodies, or from any sources, public or private, for the purposes of this Act, and to give such security as may be required and to enter into and carry out contracts or agreements in connection therewith; and may include in any contract for financial assistance with the federal government fdr or with respect to a community improvement project and related activities such conditions imposed pursuant to Federal laws as the agency may deem reasonable and appropriate and which are not inconsistent with the purposes of this Act;
(g) Within its area of operation, to make or have made all surveys and plans necessary to the carrying out of the purposes of this Act and to contract with any person, public or private, in the making and carrying out such plans and to adopt or approve, modify, and amend such plans, which plans may include but are not limited to:
(1) Plans for carrying out a program of voluntary or compulsory repair or rehabilitation of buildings and improvements;
(2) Plans for the enforcement of state and local laws, codes, and regulations relating to the use of land and the use and occupancy of buildings and improvements and for the compulsory repair, rehabilitation, demolition, or removal of buildings, and improvements;
(3) Appraisals, title searches, surveys, studies, and other plans and work necessary to prepare for the undertaking of community improvement projects and related activities;
(h) To develop, test, and report methods and techniques, and carry out demonstrations and other activities within its area of operation, for the prevention and the elimination of slums and urban blight and developing and demonstrating new or improved means of providing housing for families and persons of low income and to apply for, accept, and utilize grants of funds from the federal government for such purposes;
*406 (i) To prepare plans for and; assist in the relocation of persons (including individuals, families, business concerns, nonprofit organizations and others) displaced from a community improvement area, and to make relocation payments to or with respect to such persons for moving and readjustment expenses and losses of property for which reimbursement or compensation is not otherwise made, including the making of such payments financed by the federal government. However, no person shall be required to vacate premises from which he is being displaced until the agency had demonstrated the availability of reasonably suitable relocation resources;
I iiCi) To provide, wherever feasible, a preference to such displaced persons, consistent with their status at the time of displacement, i.e., homeowner, tenant, operator of a business, etc., to return to a community improvement area after its redevelopment, improvement, repair or rehabilitation, and to make payment or reimbursement of reasonable actual costs incurred as a result of utility relocations when such relocations are made necessary in a redevelopment area, after making appropriate adjustment for any improvements or betterments to the utility’s facilities made in connection with the relocation.
(k) To close or cause to be closed, vacate, plan, or replan streets, roads, sidewalks, ways, or other places; and to plan or cause to be replanned any part of the municipality, in accordance with all applicable laws, and Section 7(a) and (b) hereof.
(l) To sue and to be sued; adopt and have a seal and to alter the same at pleasure; to make and from time to time amend and repeal by-laws, orders, rules and regulations in order to effectuate the provisions of this act;
(m) To enter into agreements and contracts with the City of New Orleans, Louisiana, or any other public body, in pursuance of the intent of this Act;
(n) To make available to the government and to the municipality or any appropriate agency, the recommendation of the agency affecting any area in its field of operation or property therein, which it may deem likely to promote the public health, morals, safety or welfare;
(o) To rent or to provide by any other means suitable quarters for the use of the agency or to accept the use of such quarters as may be furnished by the municipality, parish or other public body and to equip such quarters with such fixtures, furnishings, records and supplies as the agency may deem necessary to enable it to exercise its powers under this Act.
(p) To receive and expend such funds as may be necessary to carry out the purposes of this Act, to apply for, accept and utilize loans, advances, or grants of funds from the federal government or other sources for any of the purposes of this Act;
(q) To exercise all or any part or combination of powers herein granted;
Section 7. Preparation and Adoption of Community Improvement Plan
The agency shall not institute a community improvement plan for an area unless the local governing body after advice thereon by the City Planning Commission has, by resolution, determined such area to be a slum or a blighted area or a combination thereof and designated such area as appropriate for a community improvement project.
(a) Community Improvement Plan
The agency may prepare or cause to be prepared a community improvement plan, and it is hereby authorized, in connection therewith, to apply for and receive plan *407 ning advances from the federal government or other bodies. Prior to submission of the community improvement Plan to the local governing body, the agency shall hold at least one public information meeting for the residents and property owners of the affected neighborhood called after notice given ten days prior to the date thereof in a newspaper of general circulation in the City. Prior to its approval of a community improvement plan, the agency shall submit such plan to the planning commission of the municipality for review and recommendation as to its conformity with the general plan for the development of the municipality as a whole. The planning commission after review of the plan by such agencies as it considers appropriate shall submit its written recommendations with respect to the proposed community improvement plan to the local governing body within forty-five days after receipt of the plan for review. Upon receipt of the approval, disapproval or recommendations of the planning commission, or if no approval, disapproval or recommendations are received within the said forty-five days, then the local governing body may proceed with the hearing on the proposed community improvement plan described in subsection* Go) hereof.
(b) Public Hearing
The local governing body shall hold a public hearing on the community improvement plan after notice thereof shall be mailed to or deposited at every place of residence and commercial establishment within said area and after public notice thereof by publication at least fourteen days prior to the hearing in a newspaper having a general circulation in the municipality. The notice shall describe the time, date, place and purpose of the hearing; shall generally identify the area covered by the plan, and shall outline the general scope of the project under consideration. Failure by anyone to receive such notice shall not invalidate approval of the plan.
At the hearing the governing body shall afford an opportunity to all persons or agencies interested to be heard and shall receive, make known and consider recommendations in writing with reference to the community improvement plan.
The governing body shall approve, reject, make recommendations for changes, or modify the community improvement plan as submitted. In the event that the community improvement plan involves property located within the Vieux Carre section of the city, as defined in the Louisiana Constitution, the community improvement plan must first be approved by the Vieux Carre Commission insofar as concerns that property which is located within the Vieux Carre section. The governing body shall not approve a community improvement plan unless it is satisfied that adequate provisions will be made to rehouse displaced families, if any, without undue hardship.
haUpon approval by the governing body of the community improvement plan, the agency is authorized to take such action as may be necessary to carry it out.
(c) Community Approval of Redevelopment Plan or Project.
Each redevelopment plan or project proposed through the plans prepared or caused to be prepared by the agency in compliance with this Act shall be approved by the qualified electorate of the municipality, provided however, an affirmative vote of the majority in number of the qualified electors voting in an election to authorize the issuance of any bonds the proceeds of which will be used to provide any part or all of the municipality’s share of project costs shall constitute electorate approval of the redevelopment plan or pro *408 ject and the municipality and agency may proceed as herein authorized to carry it out.
No public funds shall be expended for the placing of any advertisement in news media to promote an affirmative vote in an election for the issuance of bonds or for other revenue raising measures used in connection with financing any jpart or all of the municipality’s share of such plan or project cost, but nothing contained herein shall be construed to prohibit any other advertising regarding such elections except such advertising as is now or hereafter prohibited by law.
(d) Modification of Plans
Subject to the provisions of Sub-section (b) above a community improvement plan may be modified at any time, but if it is modified after the lease or sale by the agency of real property in the redevelopment area, such modification shall be subject to such rights as a lessee or purchaser or his successor or successors in interest may be entitled to assert; provided however, that no public hearing shall be required if the City Council shall determine by resolution that the modification is minor in nature.
(e) Disaster Areas
Notwithstanding any other provisions of the Act, whenever the local governing body has certified that an area is in need of redevelopment or rehabilitation as a result of an act of God, fire, bombing, riot, or other catastrophe, the local governing body may approve a community improvement plan or project with respect to such area without regard to the provisions of subsections (a) and (b) of this Section.
Section 8. Acquisition of Real Property in Community Improvement Area
(a) Subject to the requirements of Section 7 hereof, and except as provided in Section 6(d), the agency may acquire by purchase, lease, option, gift, grant, bequest, device or by the. exercise of the power of expropriation any real property, or interest therein, which it may deem necessary for or in connection with a community improvement plan or project under this Act. The agency may exercise the power of expropriation in the manner provided in the Civil Code relative to' the transfer of property, and the laws supplementary or amendatory thereto, or it may exercise the power of expropriation in the manner now or which may be hereafter provided by law for the exercise of the power of expropriation. Property already devoted to a public use may be purchased in a like manner, but no real property belonging to the United States, the state, or any political subdivision of the state, may be acquired without the consent of the political body owning such property.
(b) In any proceeding to fix or assess compensation for dámages for the purchase of property, or any interest therein, through the exercise of expropriation, evidence or testimony bearing upon the following matters shall be admissible and shall be considered in fixing such compensation or damages, in addition to evidence or testimony otherwise admissible: (1) the institution of any legal or administrative proceedings with respect to any use, condition, occupancy, or operation of such property, which is unlawful or violative of, or subject to elimination, abatement, prohibition, or correction under, and law or any ordinance or regulatory measure of the state, parish, municipality, or other political subdivision, or any agency thereof, in which such property is located, as being unsafe, substandard, unsanitary, or otherwise contrary to the public health, safety, or welfare; (2) the effect on the value of *409 such property, of any such use, condition, occupancy, or operation, or of the elimination, abatement, prohibition, or correction of any such use, condition, or operation. Testimony or evidence that any public body or public officer charged with the duty or authority so to do has rendered, made or issued any judgment, decree, determination, or order for the' abatement, prohibition, elimination, or correction of any such use, condition, occupancy, or operation shall be admissible and shall be prima facie evidence of the existence and character of such use, condition, or operation.
Section 9. Disposition of Property in Community Improvement Area
(a) The agency may sell, lease or otherwise transfer real property or any interest therein acquired by it in community Improvement areas for residential, recreational, commercial, industrial or other uses or for public use, in accordance with the community improvement plan, subject ,to such covenants, conditions and restrictions, including covenants running with the land, as it may deem to be necessary or desirable to assist in preventing the development or spread of future slums or blighted areas or to otherwise carry out the purposes of this Act. The purchasers or lessees and them successors and assigns shall be obligated to devote such real property only to the uses specified in the community improvement plan, and shall be obligated to comply with such other requirements as the agency may determine to be in the public interest, including the obligation to begin within a reasonable time any improvements on such real property required by the community improvement plan. Such real property or interest shall be sold, leased or otherwise transferred at not less than its fair value for uses in accordance with the community improvement plan. In determining the fair value of real property for uses in accordance with the 113community improvement plan, an agency shall take into account and give consideration to the use provided in such plan; the restrictions upon and the covenants conditions and obligations assumed by the purchaser or lessee; and the objectives of such plan for the prevention of the recurrence of slum or blighted areas. The agency, in any instrument of conveyance to a private purchaser or lessee, may provide that such purchaser or lessee shall be without power to sell, lease or otherwise transfer the real property without the prior written consent of the agency until he has completed the construction of any and all improvements which he has obligated himself to construct thereon. Real property acquired in accordance with the provisions of the community improvement plan shall be transferred as rapidly as feasible in the public interest consistent with the carrying out of the provisions of the project plan. Such plan and any substantial modification of such plan shall be filed as a public record in the office of the Clerk of the City Council and the Registrar of Conveyances of Orleans Parish and any conveyance, encumbrances or other contracts may incorporate the provisions thereof by reference which shall afford notice thereof to all parties.
(b) Competitive bidding procedures
The agency may dispose of real property in a community improvement area to private persons only under such reasonable competitive bidding procedures as it shall prescribe subject to the provisions hereinafter set forth. An agency must by public notice, by publication twice in ten days in a newspaper having a general circulation in the community (thirty days prior to the execution of any contract to sell, lease or otherwise transfer real property and prior to the delivery of any instrument of con- *410 veyanee with respect thereto under the provisions of this Section), invite proposals from, and make available all pertinent information to, private redevelopers or any persons interested in undertaking to redevelop or rehabilitate a community improvement area or any part thereof. Such notice shall identify the area, or portion thereof, and shall state that proposals shall be made by those in interest within thirty days after publication of said notice, and that such further information as is available may be obtained at such office as shall be designated in said notice. The agency shall consider all such redevelopment or rehabilitation proposals and the financial and legal ability of the persons making such proposals to carry them out, and may negotiate with any persons for proposals for the purchase, lease or other transfer of any real property acquired by the agency in the community improvement area. The agency may accept such proposal as it deems to be in the public interest and in furtherance of the purposes of this Act; provided, however, that a notification of intention to accept such proposal shall be filed with the local governing body not less than thirty days prior to any such acceptance. Such notice shall be a public record and shall include (1) the name of the rede-veloper or purchaser, together with the names of its officers and principal members of shareholders and investors and other interested parties, (2) the redevelop-er’s estimate of the cost of any residential development and rehabilitations, and (3) the redeveloper’s estimate of rentals and sales prices of any proposed housing involved in such redevelopment and rehabilitation. Thereafter, the agency may execute such contract in accordance with the provisions of Subsection (a) and deliver acts of sale, leases and other instruments and take all steps necessary to effectuate such contract. The competitive bidding procedures provided for by this Subsection shall not apply to disposition of property to public bodies or non-profit corporations or institutions.
(c) Temporary Operation of Real Property
The agency may temporarily operate, maintain or lease real property acquired by it in a community improvement area for or in connection with a community improvement project pending disposition of the property as authorized in this Act without regard to the provisions of Subsection (a), above, for such uses and purposes as may be deemed desirable even though not in connection with the community improvement plan.
(d) Any real property acquired pursuant to Section 6, paragraph. (d)(i) may be dis-poted of without regard to other provisions of this Section if the local governing body has consented to the disposal. Real property acquired in accordance with a community improvement plan may be disposed of to a public body for public reuse or to a non-profit corporation or institution without regard to the provisions of this section.*
(e) Notwithstanding any other provisions of this Act, where the municipality is situated in an area designated as a redevelopment area under the Federal Area Redevelopment Act (Public Law 87-27), or any act supplementary thereto, land in a community improvement project area designated under the community improvement plan for industrial or commercial uses may be disposed of to any public body or non-profit corporation for subsequent disposition as promptly as practical by the public body or corporation for redevelopment in accordance with the community improvement plan, and only the purchaser from or lessee of the public body or corporation, and their assignees, shall be required to assume the obligation of begin *411 ning the building of improvements within a reasonable time. Any disposition of land to a public body or corporation under this subsection shall be at its fair value for uses in accordance with the community improvement plan.
Section 10. Issuance of Bonds
(a) The agency shall have power to issue bonds of the agency from time to time in its discretion to finance its activities or operations under this Act, including, without limiting the generality of the foregoing, the repayment with interest of any advances or loans of funds made to the agency by the Federal Government, or other source, for any surveys or plans made or to be made by the agency in exercising its powers under this Act, and shall also have power (1) to issue refunding or other bonds of the agency from time to time in its discretion for the payment, retirement, renewal or extension of any bonds previously issued by it under this section, and (2) to provide for the replacement of lost, destroyed or mutilated bonds previously issued under this section.
114(b) Bonds which are issued under this Section: (1) May be general obligation bonds of the agency to the payment of which, as to both principal and interest, and premiums (if any), the full faith, credit, and assets (acquired and to be acquired), of the agency, are irrevocably pledged; (2) may be special obligations of the agency which, as to both principal and interest, and premiums (if any), are payable solely from and secured only by a pledge of any income, proceeds, revenues or funds of the agency derived or to be derived by it from or held or to be held by it in connection with its undertaking of any project or projects of the agency, including any grants or contributions of funds made or to be made by it with respect to any I such project or projects, and any funds derived or to be derived by it from or hold or to be held by it in connection with its sale, lease, rental, transfer, retention, management, rehabilitation, clearance, development, redevelopment, preparation for development or re- development, or its operation or other utilization or disposition of any real or personal property acquired or to be acquired by it or held or to be held by it for any of the purposes of this Act, and including any loans, grants or contributions of funds made or to be made to it by the Federal Government, in aid of any project or projects of the agency or in aid of any of its other activities or operations; (3) may be special obligations of the agency which, as to both principal and interest, and premiums (if any), are payable solely from and secured only by a pledge of any loans, grants, or contributions of funds made or to be made to it by the Federal Government, or other source, in aid of any project or projects of the agency or in aid of any of its other activities or operations; or (4) may be contingent special obligations of the agency which, as to both principal and interest, and premiums (if any), are payable solely from any funds available or becoming available to the agency for its undertaking of the project or projects involved in the particular activities or operations with respect to which such contingent special obligations are issued, but so payable only in the event such funds are or become available as aforesaid.
(c) Notwithstanding any other provisions of this section, any bonds which are issued under this ■ section, other than the contingent special obligations covered by Paragraph (4) of Subsection (b) of this section, may be additionally secured as to the payment of the principal and interest, and premiums (If, any), by a. mortgage of any Community Improvement project or projects, or any part thereof, title to which *412 is then or thereafter in the agency or any other real or personal property, or interest therein, then owned or thereafter acquired by the agency.
(d) Bonds which are issued under this section shall not constitute an indebtedness of the state of Louisiana or City of New Orleans, or any public! body of this State other than the. agency issuing such bonds, I are not subject to any constitutional or statutory debt limitation or restriction, and shall not be subject to the provisions of any other act or of the charter of the City of New Orleans relating to the authorization, issuance or sale of bonds.
(e) Bonds which are issued under this section are declared to be issued for an essential public and governmental purpose and, together wit interest thereon and income therefrom, shall be exempted from all taxes.
(f) Bonds which are issued under this section shall be authorized by resolution or resolutions of the agency and may be issued in one or more series and shall bear such date or dates, be payable upon demand or mature at such time or times, bear interest at such rate or rates, be in such de- nomination or denomination, be in such form, either coupon or registered or otherwise, any such conversion or registration privileges, have such rank or priority, be executed (in the name of the agency in such manner, be payable in such medium of payment, be payable at such place or places, be subject to such call ability provisions or terms of redemption (with or without premiums), be secured in such manner, be of such description, contain or be subject to such covenants, provisions, terms, conditions and agreements (including provisions concerning events of default), and have such other characteristics, as may be provided by such resolution or resolutions or by the indent re or mortgage, if any, issued pursuant to such resolution or resolutions. The seal (or a facsimile thereof) of the agency shall be affixed, imprinted, engraved, or otherwise reproduced upon each of its bonds issued under this section. Bonds which are issued under this section shall be executed in the name of the agency by the manual or facsimile signatures of such of its officials as may be designated in the aforesaid resolution or resolutions or trust agreement, indenture or mortgage. Coupons, if any, attached to such bonds shall bear the facsimile signature of such official of the agency a may be designated as aforesaid.
(g) Bonds which are issued under this section may be sold by it at not less than par at public sale after notice published prior to such sale in a new paper having a general circulation in the City of New Orleans or in such other medium of publication as the agency m y deem appropriate or may be exchanged by the agency, on the basis of par, for other bonds issued by it under this section: Provided, that bonds which are issued under this section may be sold by it to the Federal Government at private sale without publication of any such notice) at not less than par, and in the event that less than all of the authorized principal amount of such bonds is sold by the agency to the Federal Government, the balance or, any portion of the balance may e sold by the agency at private sale (without publication of any such notice) at not less than par at an interest cost to the agency of not to exceed the interest cost to it of the portion of the bonds sold by the Federal Government.
(h) In case any of the officials of the agency whose signatures or facsimile signatures appear on any of Its bonds or coupons which are issued under this section shall cease to be such officials before the d livery of such bonds, such signatures *413 or facsimile signatures, as the case may be, shall, nevertheless, be valid and sufficient for all purposes, the same as if such officials had remained in office until such delivery.
(i) Any provisions of any law to the contrary notwithstanding, any bonds which are issued under this section shall be fully negotiable.
|is(i) In any suit, action or proceeding involving the validity or enforceability of any bond which is issued under this section or the security therefore any such bond reciting in substance that it has been issued by the agency in connection with (1) a Community Improvement Project as herein defined, or (2) any activity or operation of the agency under this Act, shall be conclusively deemed to have been issued for such purposes; and such Community Improvement Project or such operation or activity as the case may be, shall be conclusively deemed to have be n initiated, planned, located, undertaken, accomplished and carried out in accordance with the provisions of this Act.
(k) Pending the preparation f any definitive bonds hereunder, the agency may issue it interim certificate or receipts, or its temporary bonds, with or without coupons, exchangeable for such definitive bonds when the latter shall havé been executed and are available for delivery.
(l) Persons, firms, or corporations retained or employed by an agency as advisers or consultants for the purpose of rendering financial advice and assistance may purchase or participate in the purchase, or in the distribution of its bonds when such bonds are offered at public sale.
(m) No commissioner or other officer of the agency issuing bonds under this section a d no person executing such bonds shall be liable personally on such bonds or be subject to any personal liability or accountability by reason of the issuance thereof.
Section 11. Bonds as Legal Investment
All banks, trust companies, bankers, savings banks and institutions, building and loan associations, savings and loan associations, investment companies and other persons carrying on a banking or investment .business; all insurance companies, insurance associations, and other persons carrying on an insurance business; and II executors, administrators, curators, trustees, and other fiduciaries, may legally invest any sinking funds, moneys, or other funds belonging to them or within their control in an bonds or other obligations issued by the agency pursuant to this Act: but the bonds and other obligations shall be secured by an agreement between the issuer and the Federal Government in which the issuer agrees to borrow from the Federal Government and the Federal government agrees to lend to the issuer, prior to the maturity of such bonds or other obligations, moneys in any amount which (together with any other moneys irrevocably committed to the payment of principal and interest on the bonds or other obligations) will suffice to pay the principal of the bonds or other obligations with interest to maturity thereon, which moneys under the terms of said agreement are required to be used for the purpose of paying the principal of and the interest on the bonds or other obligations at their maturity. Bonds and other obligations shall be authorized security for all public deposits. It is the purpose of this section to authorize any persons, political subdivisions and officers, public or private, to use any funds owned or con- trolled by them for the purchase of any such bonds or other obligations. Nothing contained in this section with regard to legal invest *414 ments shall be construed as relieving any persons of any duty of exercising reasonable care in selecting securities.
Section 12. Property Exempt from Taxes and From Levy and Sale by Virtue of an Execution
(a) All property of the agency, including funds owned or held by it for the purpose of this Act, shall be exempt from levy and sale by virtue of an execution, and no execution or other judicial process shall issue against the same nor shall judgment against the agency be a charge or lien upon such property; but the provisions, of this section shall not apply to or limit the right of obligees to pursue any remedies for the enforcement of any pledge or lien given pursuant to this Act by the agency on its rents, fees, grants, or revenues from community improvement projects.
(b) The property of the agency acquired or held for the purposes of this Act is declared to be public property used for essential public and governmental purposes and such property shall be exempt from all taxes of the municipality, the parish, the state, or any political subdivision thereof or. any other taxing body; but such tax exemption shall terminate when the agency sells, leases or otherwise disposes of the property in a community improvement area to a purchaser or lessee which is not a public body entitled to tax exemption with respect to the property, however, when any property or portion thereof reenters commerce while owned by the Agency or any other public body, the tax exemption herein provided for shall cease as long as such property or portion thereof is used in commerce.
Section 13. Cooperation by Public Bodies with the community improvement agency
(а) For the purpose of aiding in the planning, undertaking, or carrying out of a community improvement project and related activities authorized by this Act, any public body may, upon such terms, with or without consideration as it may determine:
(1) Dedicate, sell, donate, grant, devise, convey, or lease any of its interest in any property or grant easements, licenses or other rights or privileges therein to the agency.
(2) Incur the entire expense of any public improvements made by such public body in exercising the powers granted in this section.
(3) Do any and all things necessary to aid or cooperate in the planning or carrying out of a community improvement plan and related activities.
(4) Lend, grant, or contribute funds to the agency and borrow money and apply for and accept advances, loans, grants, contributions, and any other form of financial assistance from the Federal Government, the state, parish, or other public body, or from any other source.
|1fi(5) Enter into agreements (which may extend over any period notwithstanding any provision or rule of law to the contrary) with the Federal Government or other public body respecting action to be taken pursuant to any of the powers granted by this Act, including the furnishing of funds or other assistance in connection with a community improvement project and related activities.
(б) Cause public buildings and public facilities, including parks, playgrounds, recreational, community, educational, water, sewer, or drainage facilities, or any works which it is otherwise empowered to undertake to be furnished; furnish, dedicate, close, vacate, pave, install, grade, regrade, plan or replan streets, roads, sidewalks, ways, or other places; plan or replan, zone *415 or rezone any property of the public body or make exceptions from building regulations; and cause administrative and other services to be furnished to the agency.
If at any time title to or possession of any community improvement project is held by any public body or governmental agency, other than the agency which is authorized by this Act to engage in the undertaking, carrying out, or administration of community improvement projects and related activities, the provisions of the agreements referred to in this section shall inure to the benefit of and may be enforced by such public body or governmental agency.
(b) Any sale, conveyance, lease or agreement provided for in this section may be made by a public body without appraisal, public notice, advertisement or public bidding.
(c) For the purposes of aiding in the planning, undertaking, or carrying out of any community improvement project and related activities of the community improvement agency hereunder, the City of New Orleans may (in addition to its other powers and upon such terms, with or without consideration, as it may determine) do and perform any or all of the actions or things which, by the provisions of subsection (a) of this section, a public body is authorized to do or perform, including the furnishing of financial and other assistance.
(d) For the purposes of this Section, or for the purpose of aiding in the planning, undertaking, or carrying out of a redevelopment project and related activities the municipality may (in addition to any authority to issue bonds pursuant to Section 10) issue and sell its general obligation bonds. Any bonds issued by the municipality pursuant to this section shall be issued in the manner and within the limitation prescribed by the applicable laws of this state for the issuance and authorization of general obligation bonds by the municipality. Nothing in this section shall limit or otherwise adversely affect any other section of this Act.
Section 14. Title of Purchase Any instrument executed by the agency purporting to convey any right, title, or interest in any property under this Act shall be conclusively presumed to have been executed in compliance with the provisions of this Act insofar as title or other interest of any bona fide purchaser, lessees, or transferees of the property is concerned.
Section 15. Agencies to Have No Power of Taxation
No agency created by this Act shall have any power to levy or assess any ad valo-rem taxes, personal property taxes, or any other forms of taxes, including special assessments against any property.
Section 16. Cumulative Clause.
The powers conferred by this Act shall be in addition and supplemental to the powers conferred by any other law.
Section 17. Separability.
The provisions of this Act are hereby declared to be severable, and if any section, subsection, paragraph, provision, exception, sentence, clause, phrase or part of this Act be held unconstitutional or void, the remainder of this Act shall continue in full force and effect, it being the legislative intent, now thereby declared, that this Act would have been enacted even if such unconstitutional* or void matter had not been included therein. Notwithstanding any other evidence of legislative intent that, if any provisions or part of this Act, or the application thereof to any person or circumstances, is held invalid, the remainder of this Act, and the application of such provision or part to persons or circum *416 stances other than those as to which it is held invalid shall not be affected thereby.
Insofar as the provisions of this Act are inconsistent with the provisions of any other law, the provisions of this Act shall be controlling. The authority conferred by this Act shall be in addition and supplemental to the powers conferred by any other law.
Section 18. Safety Clause
The Legislature of Louisiana hereby finds, determines and declares that this Act i3 necessary for the immediate preservation of the public peace, health and safety-
Section 19. All other laws or parts of laws in conflict herewith are repealed.
Section 20. Definitions.
The following terms whenever used or referred to in this Act shall have the following meaning unless a different meaning is clearly indicated in the context:
(a) “Agency” or “Community Improvement Agency” or “Community Improvement Agency in and for the City of New Orleans” means the public agency created by Section 5 of this Act.
|17(b) “Local governing body” means the council charged with governing the City of New Orleans.
(c) “Public body” means the state and any parish or municipality; and any board, commission, authority, agency, district, subdivision or department, agency, instrumentality, corporate or otherwise, of the foregoing.
(d) “Mayor” means the officer having the duties customarily imposed upon the executive head of the municipality.
(e) “Municipality” means the City of New Orleans.
(f) “Clerk of Council” means the official of the city who is the custodian of the official records of the local governing body.
(g) “Federal government” means any department, agency or instrumentality, corporate or otherwise, of the United States of America.
(h) “Slum area” means an area in which there is a predominance of buildings or improvements, whether residential or nonresidential, which by reason of dilapidation, deterioration, age or obsolescence, inadequate provision for ventilation, light, air, sanitation, or open space, high density of population and overcrowding, or the existence of conditions which endanger life or property by fire and other causes, or an area of open land which, because of its location and/or situation within the city limits, is necessary for sound community growth, by re-platting* and planning and development, or any combination of such factors is conducive to ill health, transmission of disease, infant mortality, juvenile delinquency, or crime, and is detrimental to the public health, safety, morals or welfare.
(i) “Blighted area” means an area which by reason of the presence of a substantial number of slum, deteriorated or deteriorating structures, predominance of defective or in- adequate street layout, faulty lot layout in relation to size, adequacy, accessibility or usefulness, insanitary or unsafe conditions, deterioration of site or other improvements, diversity of ownership, tax or special assessment delinquency exceeding the fair value of the land, defective or unusual conditions of title, or the existence of conditions which endanger life or property by fire and other causes, or any combination of such factors, substantially impairs or arrests the sound growth of the municipality, retards the provision of housing accommodations or constitutes an economic or social liability and is a menace to *417 the public health, safety, morals, or welfare in its present condition and use; but if the area consists of any disaster area referred to in Section 7(d), it shall constitute a “blighted area”.
(j) “Community Improvement Project” means undertakings' and activities for the elimination and for the prevention of the development or spread of slums and blight, and may involve slum clearance and redevelopment in a community improvement area, or rehabilitation or conservation in a community improvement area, or a program of code enforcement in a community improvement area, and may include open land which, because of its location and/or situation, is necessary for sound community growth which is to be developed by replatting and planning, or any combination or part thereof in accordance with a community improvement plan. Such undertakings and activities may include:
(1) Acquisition of a slum or blighted area or portion thereof.
(2) Demolition and removal of buildings and improvements.
(3) Installation, construction, or reconstruction of streets, utilities, parks, playgrounds, and other improvements necessary for carrying out in the community improvement area the redevelopment objectives of this Act in accordance with the community improvement plan.
(4) Disposition of any property acquired in the community improvement area (including sale, initial leasing or retention by the agency itself) at its fair market value for uses in accordance with the community improvement plan.
(5) Carrying out plans for a program of code enforcement and a program of voluntary or compulsory repair and re- habilitation of buildings or other improvements in accordance with the community improvement plan.
(6) Acquisition of real property in the community improvement area which, under the community improvement plan, is to be repaired or rehabilitated for dwelling use or related facilities, repair or rehabilitation of the structures, and resale of the property.
(7) Acquisition of any other real property in the community improvement area where necessary to eliminate unhealthful insanitary or unsafe conditions, lessen density, eliminate obsolete or other uses detrimental to the public welfare, or otherwise to remove or prevent the spread of blight or deterioration, or to provide land for needed public or quasi public facilities.
(8) Acquisition, without regard to any requirement that the area be a slum or blighted area, of air rights in an area consisting principally of land in highways, railways or subway tracks, bridges, drainage canals, waterways, levees, wharves, warehouses, docks, tunnel entrances, or other similar facilities which have a blighting influence on the surrounding area and over which air rights sites are to be developed for the elimination of such blighting influences and for the provision of improvements (and related facilities and uses) set forth in the community improvement plan.
(9) Construction of foundations and platforms necessary for the provision of air rights sites for improvements (and related facilities and uses) set forth in the community improvement plan.
11S(10) The preservation of historic structures or locations within a project area by removing deleterious surroundings.
(11) Relocating within the project area a structure which the agency determines to be of historic value and which will be *418 disposed of to a public body or private non-profit organization which will renovate and maintain such structure for historic purposes.
(k) “Community improvement area” means a slum area or a blighted area or a combination thereof which the local governing body designates as appropriate for a community improvement project.
(l) “Community improvement plan” means a plan, as it exists from time to time for a community improvement project, which plan (1) shall conform to the general plan for the municipality as a whole except as provided in subsection 7(e), and (2) shall be sufficiently complete to indicate such land acquisition, demolition and removal of structures, redevelopment, improvements, and rehabilitation as may be proposed to be carried out in the community improvement area, zoning and planning changes, if any, land uses, maximum densities, and building requirements.
(m) “Related activities” means (1) planning work for the preparation of a general neighborhood renewal plan, or for the preparation or completion of a community-wide plan or program and (2) the functions related to the acquisition and disposal of real property pursuant to Section 6 paragraph (d) of this Act.
(n) “Real Property” means all lands, including improvements and fixtures thereon, and property of any nature appurtenant thereto, or used in connection therewith, and every estate, interest, right or use, legal or equitable, therein, including terms for years and liens by way of judgment, mortgage or otherwise.
(o) “Bonds” means any bonds (including refunding bonds), notes* interim certificates, certificates of indebtedness, debenture or other obligation.
(p) “Obligee” means any bondholder, agent, or trustee for any bondholder, or lessor demising property used in connection with any community improvement project, or any assignee or assignees of such lessor’s interest or any part thereof, and the federal government when it is a party to any contract with the agency.
(q) “Person” means any individual, firm, partnership, corporation, company, association, joint stock association, or body politic; and shall include any trustee, receiver, assignee, or other person acting in a similar representative capacity.
(r) “Area of operation” means the area within the corporate limits of the municipality.
(s) “Local option” means the option and discretion of the local governing body.
(t) “City’s Comprehensive Plan” means that plan defined in R.S. 33:101 through 33:119.
(u) “families* of low income” means those families or persons, as defined in R.S. 40:382, whose income is less than the amount determined by the Housing Authority of New Orleans to be necessary to enable them, without financial assistance to live in decent, safe and sanitary dwellings without overcrowding.
APPENDIX B
ha ACT No. 135
HOUSE BILL NO. 351
BY REPRESENTATIVES IRONS, A. ALEXANDER, FORSTER, MURRAY, WILLARD LEWIS, AND PRATT AND SENATORS BAJOIE, HAINKEL, AND JOHNSON
AN ACT
To amend and reenact Section J, Section 5(a) through (e) and (g), Section 6(intro-ductory paragraph) and (6)(c), (t), (i), *419 (n), and (0), Section 7(introductory paragraph) and (7) (a) through (d), Section 8(a), Section 8.1(A), (C), (D)(1), (8), and (tí, (E)(1) through (3), and (F), Section 9(a) through (c), Section 10(a) through (d), (t) through (h), G), (k), and (m), Section 10.1(a)(1), (3), and (8) and (b) (introductory paragraph), (b)(2), (3)(i) and (vi), 5(i), (ii)(g), (Hi) through (viii), (xii), and (xiii:), Section 11, Section 12, Section 18(a)(1), (tí, and (6) and (c), Section Ik, Section 15, Section 20(a) and G) (11) of Act No. 170 of the 1968 Regular Session of the Legislature of Louisiana, as amended by ACT No. 299 of the 1972 Regular Session of the Legislature of Louisiana, Acts Nos. 571 and 572 of the 1980 Regular Session of the Legislature of Louisiana, and Act No. 155 of the 1984 Regular Session of the Legislature of Louisiana, relative to the Community Improvement Agency in the city of New Orleans; to change the name of such agency; to provide relative to the sale of expropriated properties by the agency; to delete provisions requiring an after-acquired purchase contract between the agency and the prospective purchaser of such property; to provide for the disposition of claims against said property; and to provide for related matters.
Notice of intention to introduce this Act has been published as provided by Article III, Section 13 of the Constitution of Louisiana.
Be it enacted by the Legislature of Louisiana:
Section 1. Section 4, Section 51(a) through (e) and (g), Section 6(introductory paragraph) and (6)(c), (f), (i), (n), and (0), Section 7(introductory paragraph) and (7)(a) through (d), Section 8(a.), Section 8.1(A), (C), (D)(1), (3), and (4), (E)(1) through (3), and (F), Section 9(a) through (c), Section 10(a) through (d), (0 through (h), G), (k), and (m), Section 10.J.(a)(l), (3), and (8) and (b) (introductory paragraph), (b)(2), (3)(i) and (vi), 5(i), (ii)(g), (iii) through (viii), (xii), and (xiii), Section 11, Section 12, Section 13(a)(1), (4), and (6) and (c), Section 14, Section 15, Section 20(a) and G) (11) of Act No. 170 of the 1968 Regular Session of the Legislature of Louisiana, as amended by Act No. 299 of the 1972 Regular Session of the Legislature of Louisiana, Acts Nos. 571 and 572 of the 1980 Regular Session of the Legislature of Louisiana, and Act No. 155 of the 1984 Regular Session of the Legislature of Louisiana are hereby amended and reenacted to read as follows:
Section 4. Encouragement of Private Enterprise
The “New Orleans Redevelopment Authority”, to. the greatest extent it determines to be feasible in carrying out the provisions of this Act, shall afford maximum opportunity, consistent with the sound needs of the City of New Orleans as a whole, to the rehabilitation or redevelopment of the community improvement area by private enterprise. The authority shall give consideration to this objective in exercising its, authority under this Act.
Section 5. Creation of the New Orleans Redevelopment Authority by local Option
(a) There is hereby, created in and for the City of New Orleans a public body corporate and politic known as the New Orleans Redevelopment Authority. The authority shall not transact any business or exercise any powers conferred upon the authority by this Act until and unless the local governing body has by resolution authorized the authority to exercise its powers under this Act.
The governing body of the City of New Orleans, Louisiana, shall by resolution, at any time after the passage of this Act, call *420 a public hearing to determine the need to activate the New Orleans Redevelopment Authority. Notice of such hearing shall be published at least ten days preceding the day on which the hearing is to be held, in a newspaper having a general circulation in the municipality. Upon the date fixed for said hearing to be held upon notice as 12oprovided herein, a full opportunity to be heard shall be granted to all residents and taxpayers of the municipality. If the governing body finds it to be in the public interest that an authority for the municipality, as authorized by this Act, be activated to exercise the authority herein provided, then the local governing body shall adopt a resolution so finding and declaring and shall cause notice of such resolution to be given to the mayor of the municipality, who shall there, upon appoint, with the advice and consent of the local governing body and as set forth in Subsection (b) of this Section, commissioners of the New Orleans Redevelopment Authority. A certificate signed by the mayor of the municipality and the commissioners shall then be filed in the office of the secretary of state and there remain of record setting forth that the local governing body made the aforesaid finding and declaration and that the mayor of the municipality had appointed them as commissioners. Upon the filing of such certificate, the commissioners and their successors shall constitute the New Orleans Redevelopment Authority, which shall be a political corporation of the state and shall have all the power and authority as set forth in this Act.
In any suit, action, or proceeding involving the validity or enforcement of any contract or act of the authority, a copy of the certificate, duly certified by the secretary of state, shall be admissible in evidence in any such suit, action, or proceeding.
(b) Appointment and Qualification of Commissioners
Upon the certification of a resolution declaring the need for an authority to operate, as set forth in Subsection (a) above, the mayor of the City of New Orleans shall appoint as commissioners of the authority with the advice and consent of the City Council of the City of New Orleans, seven citizens who shall be qualified electors of the municipality, one from each council-manic district of the city and two from the city at large, as follows:
The mayor shall request each of the members of the legislature from the City of New Orleans to submit to him one nominee from his district for the position of commissioner. This request shall be made in writing and shall be mailed to each legislator at his last known address. The legislator shall have ten days from the date of the mailing of the request by the mayor in which he may submit to the mayor the name of a nominee. Within 20 days after the mailing of the request to the members of the legislature, the mayor shall appoint from those nominees submitted by the members of the legislature the seven commissioners of the authority. The failure of any member of the legislature to receive the written request from the mayor or the failure of any legislator to make a nomination within the time specified shall not affect the validity of the appointments subsequently made by the mayor. Appointment of a commissioner at the expiration of the term of an appointed commissioner, or appointment of a commissioner to fill the unexpired term of a position vacated by a commissioner, shall be made by the mayor from a panel nominated by the legislators following the same procedure as above set forth for the appointment of the first commissioners of the authority.
*421 A certifícate of the appointment or reappointment of any commissioner shall be filed with the clerk of the city council, and such certificate shall be conclusive evidence of the due proper appointment of such commissioner.
(c) Tenure and Compensation of Commissioners The members who are first appointed shall serve for terms as follows: one for one year, one for two years, one for three years, two for four years, and two for five years, respectively, from the date of their appointment as shall be specified at the time of their appointment. Thereafter the term of office shall be five years. A member shall hold office until his successor has been appointed and qualified. Vacancies for unexpired terms shall be promptly filled by appointment by the mayor from a panel nominated by the legislators following the same procedure as set forth above for the appointment of the first commissioners of the authority. A commissioner shall receive no compensation for his service, but he shall be entitled to reimbursement of actual expenses, including traveling expenses, incurred in the discharge of his duties.
(d) Organization of the Authority
The members of the authority shall initially and annually thereafter select from among themselves a chair- man, a vice chairman, and such other officers as the authority may determine. The authority may employ an executive director and other employees as it may require and shall determine their qualifications and compensation. The authority may engage or employ counsel and legal staff. Four commissioners of the authority shall constitute a quorum for its meetings.
| Action may be taken by the authority upon a vote of a majority of the commissioners of the authority unless in any case the bylaws shall require a, larger number. Members of the authority or other officers shall not be liable personally on the bonds or other obligations of the authority, and the rights of creditors shall be solely against such authority.
(e)Interest of Commissioners or Employees
No commissioner or employee of the authority shall acquire any interest, direct or indirect, in any community improvement project or in any property included or planned to be included in any community improvement area, or in any area which he may have reason to believe may be certified to be a community improvement area, nor shall he have any interest, direct or indirect, in any contract or proposed contract for materials or services to be furnished or used by the authority, or in any con- tract with a redeveloper or prospective redeveloper relating directly or indirectly to any community improvement project. The acquisition of any such interest in a community improvement project or in any such property or contract shall constitute misconduct in office. If any commissioner or employee of the authority shall already own or control any interest, direct or indirect, in any property to be included in any community improvement project under the jurisdiction of the authority, or has any such interest in any contract for material or services to be furnished or used in connection with any community improvement project, he shall disclose he same in writing to the authority and such disclosure shall be entered in writing upon the minute books of the au-' thority. Failure to make such disclosure shall constitute misconduct in office. Any such commissioner shall refrain from discussion or voting on any proposal in which he shall have an interest.
[[Image here]]
(g) Annual Report
*422 The authority authorized to transact business and exercise powers under this Act shall file, with the local governing body, on or before March thirty-first of each year, a report of its activities for the preceding calendar year, which report shall include a complete financial statement setting forth its assets, liabilities, receipts, and disbursements as of the end of such calendar year. At the time of filing the report, the authority shall publish in a newspaper of general circulation in the community, a notice to the effect that such report has been filed with the local governing body and that the report is available for inspection during business hours in the office of the clerk of the council and in the office of the authority.
Section 6. Authority
The New Orleans Redevelopment Authority shall have all the authority and power necessary or convenient to carry out and effectuate the purposes and provisions of the Act, including without limiting the generality of the foregoing, the following authority which shall be in addition to others herein granted:
[[Image here]]
(c) Within its area of operation, to acquire by purchase, lease, option, gift, grant, bequest, device, expropriation, or otherwise, any real property (or personal property for its administrative purposes) together with any improvements thereon; to hold, improve, clear, or prepare for redevelopment of any such property; to mortgage, pledge, hypothecate, or otherwise encumber or dispose of any real property; to insure or provide for the insurance of any real or personal property or operations of the municipality against any risks or hazards, including the power to pay premiums on any such insurance; and to enter into any contracts necessary to effectuate the purpose of this Act; however, no statutory provision with respect to the clearance or disposition of property by public bodies shall restrict the authority exercising powers thereunder, in the exercise of such functions with respect to a community improvement project and related activities, unless the legislature shall specifically so state.
[[Image here]]
(f) To borrow money and to apply for and accept advances, loans, grants, contributions, and any other form of assistance from the federal government, the state, parish, or other public bodies, or from any sources, public or private, for the purposes of this Act, and to give such security as may be required and to enter into and carry out contracts or agreements in connection therewith; and to include in any contract for financial assistance with the federal government for or with respect to a community improvement project and related activities such conditions imposed pursuant to federal laws as the authority may deem reasonable and appropriate and which are not inconsistent with the purposes of this Act.
122 ' * *
(i) To prepare plans for and assist in the relocation of persons (including individuals, families, business concerns, nonprofit organizations, and others) displaced from a community improvement area, and to make relocation payments to or with respect to such persons for moving and readjustment expenses and losses of property for which reimbursement or compensation is not otherwise made, including the making of such payments financed by the federal government. However, no person shall be required to vacate premises from which he is being displaced until the authority had demonstrated the availability of reasonably suitable relocation resources.
*423 [[Image here]]
(n) To make available to the government and to the municipality or any appropriate agency, the recommendation of the authority affecting any area in its field of operation or property therein, which it may deem likely to promote the public health, morals, safety, or welfare.
(o) To rent or to provide by any other means suitable quarters for the use of the authority or to accept the use of such quarters as may be furnished by the municipality, parish, or other public body and to equip such quarters with such fixtures, furnishings, records, and supplies as the authority may deem necessary to enable it to exercise its powers under this Act.
[[Image here]]
Section 7. Preparation and Adoption of Community Improvement Plan
The authority shall not institute a community improvement plan for any area unless the local governing body after advice thereon by the City Planning Commission has, by resolution, determined such area to be a slum or a blighted area or a combination thereof and designated such area as appropriate for community improvement project.
(a) Community Improvement Plan
The authority may preparer cause to be prepared a community improvement plan, and it is hereby authorized, in connection therewith, to apply for and receive planning advances from the federal government or other bodies. Prior to submission of the community improvement plan to the local governing body, the authority shall hold at least one public information meeting for the residents and property owners of the affected neighborhood called after notice give ten days prior to the date thereof in a newspaper of general circulation in the city. Prior to its approval of a community improvement plan, the authority shall submit such plan to the planning commission of the municipality for review and recommendation as to its conformity with the general plan for the development of the municipality as a whole. The planning commission after review of the plan by such agencies as it considers appropriate shall submit its written recommendations with respect to the proposed community improvement plan to the local governing body within forty-five days after receipt of the plan for review. Upon receipt of the approval, disapproval, or recommendations of the planning commission, or if no approval, disapproval, or recommendations are received within the said forty-five days, then the local governing body may proceed with the hearing on the proposed community improvement plan described in Subsection (b) hereof.
(b) Public Hearing
The local governing body shall hold a public hearing on the community improvement plan after notice thereof shall be mailed to or deposited at every place of residence and commercial establishment within said area and after public notice thereof by publication at least fourteen days prior to the hearing in a newspaper having a general circulation in the municipality. The notice shall describe the time, date, place, and purpose of the hearing; shall generally identify the area covered by the plan, and shall outline the general scope of the project under consideration. Failure by anyone to receive such notice shall not invalidate approval of the plan.
At the hearing the governing body shall afford any opportunity to all persons or agencies interested to be heard and shall receive, make known, and consider recommendations in writing with reference to the community improvement plan.
*424 The governing body shall approve, reject, make recommendations for changes, or modify the community improvement plan as submitted. In the event that the community improvement plan involves property located within the Vieux Carre section of the city, as defined in the Constitution of Louisiana, the community improvement plan must first be approved by the Vieux 123Carre Commission insofar as concerns that property which is located within the Vieux Carre section. The governing body shall not approve a community improvement plan unless it is satisfied that adequate provisions will be made to rehouse displaced families, if any, without undue hardship.
Upon approval by the governing body of the community improvement plan, the authority is authorized to take such action as may be necessary to carry it out.
(c) Community Approval of Redevelopment Plan or Project
Each redevelopment plan or project proposed through I the plans prepared or caused to be prepared by the authority in compliance with this Act shall be approved by the qualified electorate of the municipality; however, an affirmative vote of the majority in number of the qualified electors voting in an election to authorize the issuance of any bonds the proceeds of which will be used to provide any part or all of the municipality’s share of project costs shall constitute’ electorate approval of the redevelopment plan or project and the municipality and the authority may proceed as; herein authorized to carry it out.
No public funds shall be expended for the placing of any advertisement in news media to promote an affirmative vote in an election for the issuance of bonds or for other revenue raising measures used in connection with financing any part or all of the municipality’s share of such plan or project cost, but nothing contained herein shall be construed to prohibit any other advertising regarding such elections except such advertising as is now or hereafter prohibited by law.
(d) Modification of Plans
Subject to the provision of Subsection (b) above a community improvement plan may be modified at any time, but it is modified after the lease or sale by the authority of real property in the redevelopment area, such modification shall be subject to such rights as a lessee or purchaser or his successor or successor in interest may be entitled to assert; however, no public hearing shall be required if the city council shall determine by resolution that the modification is minor in nature.
[[Image here]]
Section 8. Acquisition of Real Property in Community Improvement Area
(a) Subject to the requirements of Section 7 hereof, and except as provided in Section 6(d), the authority may acquire by purchase, lease, option, gift, grant, bequest, device, or by the exercise of the power of expropriation any real property, or interest therein, which it may deem necessary for or in connection with a community improvement plan or project under this Act. The authority may exercise the power of expropriation in the manner provided in the Civil Code relative to the transfer of property, and the laws supplementary or amendatory thereto, or it may exercise the power of expropriation in the manner now or which may be hereafter provided by law for the exercise of the power of expropriation. Property already devoted to a public use may be purchased in a like manner, but no real property belonging to the United States, the state, or any political subdivision of the state *425 may be acquired without the consent of the political body owning such property.
[[Image here]]
Section 8.1. Blighted property removal
A. Notwithstanding any other provision of this Act, the New Orleans Redevelopment Authority shall have the power to acquire by purchase, gift, bequest, expropriation, negotiation, or otherwise, any blighted property as defined in this Section, either within or outside a designated community improvement area and, further, to hold, clear, manage, and dispose of said property, all in accordance with the procedures set forth herein, which procedures shall be exclusive for the acquisition of individual blighted property by the authority.
* * *
C. The authority shall not acquire any blighted property by expropriation unless such property has been resolved to be blighted by the local governing authority and the local governing authority has authorized the acquisition of such property by the authority.
D. The procedure for certification of blighted proper- ties shall be as follows:
(1) The Department of Safety and Permits shall submit to the city planning commission and the authority a list of those properties which are determined to be vacant, uninhabitable, and hazardous and which otherwise meet the criteria set forth in Subsection B herein for the determination of blight.
[[Image here]]
|?4(3) The city planning commission shall transmit the list of those properties which are being recommended for a determination of blight and acquisition by the authority to the local governing authority, the Department of Safety and Permits, and the authority and shall request that the local governing authority place these properties on its agenda after giving notice to the owner or one of the owners by registered or certified mail at his last known address. If.no last known address is available, notice shall be given in the official journal of the municipality. The notice shall include a listing of each property and the respective owner or owners and shall state the date, time, and place of a hearing to determine whether said properties are in fact blighted and whether acquisition thereof by the authority is necessary. Notice by mail or publication must be accomplished at least thirty days prior to the date of such hearing.
(4) On the date of the hearing, a member of the Department of Safety and Permits, the city planning commission, and the authority shall appear before the local governing authority and present testimony as requested concerning the properties under consideration.
After hearing all of the information and evidence presented, the local governing authority shall certify by resolution those properties which are determined to be blighted and shall authorize the authority to acquire said properties if the authority finds that such acquisition is necessary and feasible.
E.(1) Upon receipt of authorization to acquire, the authority shall begin immediately to procure purchasers for any properties acquired pursuant to this Section in order to facilitate the immediate transfer and development thereof.
(2) Expropriation pursuant to this Section shall confer title to the property conveyed in the deed of sale free of all mortgages, hens, privileges, taxes, and encumbrances, provided that notice of such expropriation shall be sent at least thirty days prior to commencement of such expropriation proceedings by regis *426 tered or certified mail, return receipt requested, by personal service, or by other means provided by law, to all parties having legally protected property interest in such property whose names and addresses can be reasonably ascertained. The proceeds from the expropriation of property pursuant to this Section shall be I credited and applied against the most recent taxes, mortgages, and liens imposed pursuant to R.S. 33:1236, land paving and other local improvement assessments due on the property in accordance with the order of preference in RS. 47:2190, and any funds remaining after full payment of all taxes, mortgages, liens, and assessments shall be distributed to creditors in accordance with the priorities of distribution set forth in Article 2377 9f the Code of Civil Procedure. Any taxes, charges imposed pursuant, to RS. 33:1236, and paving or other local improvement assessments remaining past due and unpaid after the application of the expropriation proceeds shall remain the responsibility of the previous owner of the property.
(3) Prior to acquisition of any properties declared blighted and in accordance with procedures established by the authority, such authority shall offer technical or financial assistance as may be available for rehabilitation to the property owner.
F. The authority may receive and utilize any federal, state, local, or other funds as may be appropriated or otherwise made available in order to effectuate the purpose of this Section.
Section 9. Disposition of Property in Community Improvement Area
(a) The authority may sell, lease, or otherwise transfer real property or any interest therein acquired by it in community improvement areas for residential, recre-ationhl, commercial, industrial, or other uses or for public use, in accordance with the community improvement plan, subject to such covenants, conditions, and restrictions, including covenants running with the land, as it may deem to be necessary or desirable to assist in preventing the development or spread of future slums or blighted areas or to otherwise carry out the purposes of this Act. The purchasers or lessees and their successors and assigns shall be obligated to devote such real property only to the uses specified in the community improvement plan, and shall be obligated to comply with such other requirements as the authority may determine to be in the public interest, including the obligation to begin within a reasonable time any improvements on such real property required by the community improvement plan. Such real property or interest shall be sold, leased, or otherwise-transferred at not less than its fair value for uses in accordance with the community improvement plan. In determining the fair value of real property for uses in accordance with the community improvement plan, the authority shall take into account and give 1 ¡^consideration to the use provided in such plan; the restrictions upon and the covenants, conditions, and obligations assumed by the purchaser or lessee; and the objectives of such plan for the prevention of the recurrence of slum or blighted areas. The authority, in any instrument of conveyance to a private purchaser or lessee, may provide that such purchaser or lessee shall be without power to sell, lease, or otherwise transfer the real property without the prior written consent of the authority until he has completed the construction of any and all improvements which he has obligated himself to construct thereon. Real property acquired in accordance with the provisions of the community improvement plan shall be transferred as rapidly as feasible in the public interest *427 consistent with the carrying out of the provisions of the project plan. Such plan and any substantial modification of such plan shall be filed as a public record in the office of the Clerk of the City Council and the Registrar of Conveyances of Orleans Parish and any conveyance, encumbrances, or other contracts may incorporate the provisions thereof by reference which shall afford notice thereof to all parties.
(b) Competitive bidding procedures
The authority may dispose of real property in a community improvement area to private persons only under such reasonable competitive bidding procedures as it shall prescribe subject to the provisions hereinafter set forth. The authority must by public notice, by publication twice in ten days in a newspaper having a general circulation in the community (thirty days pri- or to the execution of any contract to sell, lease, or otherwise transfer real property and prior to the delivery of any instrument of conveyance with respect thereto under the provisions of this Section), invite proposals from, and make available all pertinent information to, private redevelopers or any persons interested in undertaking to redevelop or rehabilitate a community improvement area or any part thereof. Such notice shall identify the area, or portion thereof, and shall state that proposals shall be made by those in interest within thirty days after publication of said notice, and that such further information as is available may be obtained at such office as shall be designated in said notice. The authority shall consider all such redevelopment or rehabilitation proposals and the financial and legal ability of the persons making such proposals to carry them out, and may negotiate with any persons for proposals for the purchase, lease, or other transfer of any real property acquired by the authority in the community improvement area. The authority may accept such proposal as it deems to be in the public interest and in furtherance of the purposes of this Act; however, a notification of intention to accept such proposal shall be filed with the local governing body not less than thirty days prior to any such acceptance. Such notice shall be a public record and shall include: (1) the name of the redeveloper or purchaser, together with the names of its officers and principal members of shareholders and investors and other interested parties; 2) the rede-veloper’s estimate of the cost of any residential development and rehabilitations; and (3) the redeveloper’s estimate of rentals and sales prices of any proposed housing involved in such redevelopment and rehabilitation. Thereafter, the authority may execute such contract in accordance with the provisions 'of Subsection (a) and deliver acts of sale, leases, and other instruments and take all steps necessary to effectuate such contract. The competitive bidding procedures provided for by this Subsection shall not apply to disposition of property to public bodies or nonprofit corporations or institutions.
(c) Temporary Operation of Real Property
The authority may temporarily operate, maintain, or lease real property acquired by it in a community improvement area for or in connection with a community improvement project pending disposition of the property as authorized in this Act without regard to' the provisions of Subsection (a) above, for such uses and purposes as may be deemed desirable even though not in connection with the community improvement plan.
* * *
Section 10. Issuance of Bonds
(a) The authority shall have power to issue bonds of the authority from time to *428 time in its discretion to finance its activities or operations under this Act, including without limiting the generality of the foregoing the repayment with interest of any advances or loans of funds made to the authority by the federal government, or other source, for any surveys or plans made or to be made by the authority in exercising its powers under this Act, and shall also have power (1) to issue refunding or other bonds of the authority from time to time in its discretion for the payment, retirement, renewal, or extension of any bonds previously issued by it under this | ^Section; and (2) to provide for the replacement of lost, destroyed, or mutilated bonds previously issued under this Section.
(b)Bonds which are. issued under this Section: (1) may be. general obligation bonds of the authority to the payment of which, as to both principal and interest, and premiums (if any), the full faith, credit, and assets (acquired and to be acquired), of the authority, are irrevocably pledged; (2) may be special obligations of the authority which, as to both principal and interest, and premiums (if any), are payable solely from and secured only by a pledge of any income, proceeds, revenues, or funds of the authority derived or to be derived by it from or held by it in connection with its undertaking of any project or projects of the authority, including any grants or contributions of funds made or to be made by it with respect to any such project or projects, and any funds derived or to be derived by it from or hold or to be held by it in connection with its sale, lease, rental, transfer, retention, management rehabilitation, clearance, development, redevelopment, preparation for development or redevelopment, or its operation or other utilization or disposition of any real or personal property acquired or to be acquired by it or held or to be held by it for any of the purposes of this Act, and including any loans, grants, or contributions of funds made or to be made to it by the federal government, in aid of any project or projects of the authority or in aid of any of its other activities or operations; (3) may be special obligations of the authority which, as to both principal and interest, and premiums (if any), are payable solely from and secured only by a pledge of any loans, grants, or contributions of funds made or to be made to it by the federal government, or other source, in aid of any project or projects of the authority or in aid of any of its other activities or operations; or (4) may be contingent special obligations of the authority which, as to both principal and interest, and premiums (if any), are payable solely from any funds available or becoming available to the authority for its undertaking of the project or projects involved in the particular activities or operations with respect to which such contingent special obligations are issued, but so payable only in the event such funds are or become available as aforesaid.
(c) Notwithstanding any other provisions of this Section, any bonds which are issued under this Section, other than the contingent special obligations covered by Paragraph (4) of Subsection (b) of this Section, may be additionally secured as to the payment of the principal and interest, and premiums (if any), by a mortgage of any community improvement project or projects, or any part thereof, title to which is then or thereafter in the authority or any other real or personal property, or interest therein, then owned or thereafter acquired by the authority.
(d) Bonds which are issued under this Section shall not constitute an indebtedness of the state of Louisiana or City of New Orleans, or any public body of this state other than the authority issuing such bonds, are not subject to any constitutional *429 or statutory debt limitation or restriction, and shall not be subject to the provisions of any other act or of the charter of the City of New Orleans relating to the authorization, issuance, or sale of bonds.
* * *
(f) Bonds which are issued under this Section shall be authorized by resolution or resolutions of the authority and may be issued in one or more series and shall bear such date or dates, be payable upon demand or mature at such time or times, bear interest at such rate or rates, be in such denomination or denominations, be in such form, either coupon or registered or otherwise, carry such conversion or registration privileges, have such rank or priority, be executed (in the name of the authority) in such manner, be payable in such medium of payment, be payable at such place or places, be subject to such call ability provisions or terms of redemption (with or without premiums), be secured in such manner, be of such description, contain or be subject to such covenants, provisions, terms, conditions, and agreements (including provisions concerning events of default), and have such other characteristics, as may be provided by such resolution or resolutions or by the in'- denture or mortgage, if any, issued pursuant to such resolution or resolutions. The seal (or a facsimile thereof) of the authority shall be affixed, imprinted, engraved, or otherwise reproduced upon each of its bonds issued under this Section. Bonds which are issued under this Section shall be executed in the name of the authority by the manual or facsimile signatures of such of its officials as may be designated in the aforesaid resolution or resolutions or trust agreement, indenture, or mortgage. Coupons, if any, attached to such bonds shall bear the facsimile signature of such official of the authority as may be designated as aforesaid.
(g) The bonds of the New Orleans Redevelopment Authority may be sold at public or private sale in such manner and from time to time as may be determined by the board of commissioners to be most advantageous.
| j>,7(h) In case any of the officials of the authority whose signatures or facsimile signatures appear on any of its bonds or coupons which are issued under this Section shall cease to be such officials before the delivery of such bonds, such signatures or facsimile signatures, as the case may be, shall, nevertheless, be valid and sufficient for all purposes, the same as if such officials had remained in office until such delivery.
* * *
(j) In any suit, action, or proceeding involving the validity or enforceability of any bond which is issued under this Section or the security therefor, any such bond reciting in substance that it has been issued by the authority in connection with (1) a community improvement project as herein defined, or (2) any activity or operation of the authority under this Act, shall be conclusively deemed to have been issued for such purposes; and such community improvement project or such operation or activity, as the case may be, shall be conclusively deemed to have been initiated, planned, located, undertaken, accomplished, and carried out in accordance with the provisions of this Act.
(k) Pending the preparation of any definitive bonds hereunder, the authority may issue its interim certificate or receipts, or its temporary bonds, with or without coupons, exchangeable for such definitive bonds when the latter shall have been executed and are available for delivery.
*430 [[Image here]]
(m) No commissioner or other officer of the authority issuing bonds under this Section and no person executing such bonds shall be liable personally on such bonds or be subject to any personal liability or accountability by reason of the issuance thereof.
Section 10.1. Definitions, home loans, bonds, powers, restrictions, presumptions
(a) For the purpose of this Section unless the context clearly otherwise requires, the following definitions shall apply and be equally applicable to both the singular and plural forms of any of the defined terms:
(1) “Authority” means the New Orleans Redevelopment Authority in and for the City of New Orleans created pursuant to this Act.
[[Image here]]
(3) “Development costs” means and includes the sum total of all reasonable or necessary costs incidental to the acquisition, construction, reconstruction, rehabilitation, repair, alteration, improvement, and extension of a residential development, including without limitation the following: the cost of studies and surveys; plans and specifications; architectural and engineering services; underwriting fees; legal, accounting, marketing, and other special services relating to residential development or incurred in connection with the issuance and sale of bonds; necessary application and other fees to federal, state, and local government agencies for any requisite approvals for construction, for assisted financing, or otherwise; financing, acquisition, demolition, construction, equipment, and site development of new and rehabilitated buildings; the relocation of utilities, public ways, and parks; the construction of recreational, cultural, and commercial facilities; rehabilitation, reconstruction, repair, or remodeling of existing buildings and all other necessary and incidental expenses, including trustee and rating agency fees and ah initial bond and interest reserve together with interest on bonds issued to finance a residential development to a date six months subsequent to the estimated date of completion; any premiums for mortgage insurance or insurance with respect to bonds, and such other expenses as the- authority may deem appropriate to effectuate the purposes of this Section and this Act.
(8) “Mortgagor” means a person or persons whose adjusted gross aggregate income, together with the adjusted gross aggregate income of all persons who intend to reside with such person or persons in one dwelling unit, shall not have exceeded forty thousand dollars (or such lesser amount or amounts as’ shall be deemed by the authority to be in furtherance of its public purposes) for the immediately preceding taxable year and who has received a home mortgage on a home.
* * *
. (b) The authority is authorized and empowered to establish programs for residential development, including but not limited to low interest rate home mortgage programs for qualified persons, by issuing mortgage revenue bonds to provide funds to persons to enable them to purchase or to rehabilitate, reconstruct, or improve single or multiple unit owner-occupied or rental family residences in community improvement or community development areas. In order to accomplish such purpose, the authority shall have and is hereby granted the following powers which shall be in addition to all other powers which it may have under this Act or general law:
[[Image here]]
(2) Home mortgages
*431 li>R(i) To acquire, contract, and enter into advance commitments to acquire home mortgages owned by lending institutions at such purchase prices and upon other terms and conditions as shall be determined by the authority or such other person as it may designate as its agent, to make and execute contracts with nonprofit housing development corporations and lending institutions for the origination and servicing of home mortgages and to pay the reasonable value of services rendered under those contracts.
(ii) To make loans to government approved nonprofit lending institutions and lending institutions under terms and conditions which, in addition to other provisions as determined by the authority, shall require the lending institutions to use substantially all of the net proceeds thereof, directly or indirectly, for the making of home mortgages in an aggregate principal amount substantially equal to the amount of such net proceeds.
(iii) To establish, by rules or regulations, in resolutions relating to any issuance of revenue bonds or in any financing documents relating to such issuance, such standards and requirements applicable to the purchase of home mortgages or the making of loans to lending institutions as the authority deems necessary or desirable, including but not limited to: (a) the location and other characteristics of homes to be financed by home mortgages; (b) the terms and conditions of home mortgages to be acquired; (c) the amounts and types of insurance coverage required on homes, home mortgages, and revenue bonds; (d) the representations and warranties of lending institutions confirming compliance with such standards and requirements; (e) restriction as to interest rate or other terms of home mortgages or the return realized therefrom by lending institutions; (f) any other matters related to the purchase of home mortgages or the making of loans to lending institutions as shall be deemed relevant by the authority; however, in no such case shall any such lending institution charge and retain an origination fee in excess of three percent of the principal amount of any such .home mortgage; and further provided that all such home mortgages shall bear a stated interest rate which, as of the business day immediately preceding the date of execution of a contract for the sale of the related revenue bonds, is (1) at least one and one-half percent less than the stated interest rate being charged as of such day by such lending institution for its ninety-five percent loan-to-value mortgage loans (computed on it weighted average basis if such lending institution has more than one such rate) or (2) if such lending institution does not regularly offer ninety-five percent loan-to-value mortgage loans, at least one percent less than the stated interest rate being charged as of such day by such lending institution for its eighty percent loan-to-value mortgage loans (computed on a weighted average basis if such lending institution has more than one such rate).
(iv)To require from each lending institution from which home mortgages are purchased or to which loans are made the submission, at the time of such purchase or loan, of evidence satisfactory to the authority of the ability and intention of such lending institution to make home mortgages and the submission, within the time specified by the authority for making disbursements for home mortgages, of evidence satisfactory to the authority of the making of home mortgages and of compliance with any standards and requirements established by the authority; in connection therewith, the authority may inspect the books and records of such lending institutions.
*432 (3) Financing of purchases or funding the making of mortgages for residential developments.
(i)To issue revenue bonds to defray, in whole or in part, the development costs of any residential development; to issue its revenue bonds to defray, in whole or in part, the costs of purchasing, or funding the making of, mortgages for residential developments, including but not limited to the costs of studies and surveys, insurance premiums, underwriting fees, legal, accounting, and marketing services incurred in connection with the issuance and sale of such revenue bonds, including bond and interest reserve accounts and trustee, custodian, and rating agency fees; and to designate appropriate names for such bonds. The authority need not acquire or hold title to or any interest in a residential development or home mortgage.
* * *
(vi) To issue its revenue bond in accordance with this Section to refund in whole or in part at any time revenue bonds theretofore issued by the authority under authority of this Section.
* * *
(5) Authorization, security, sale, and certain other details of revenue bonds
(i) The authority shall authorize revenue bonds by one or more bond resolutions adopted by a majority of its commissioners. Any bond resolution shall be published one time in the official journal of the City of New Orleans, Louisiana; however, it shall not be necessary to 1 ^publish any exhibits to such bond resolution if the same are available for public inspection and such fact is stated in the publication. For thirty days after the date of publication, any person in interest may contest the legality of the bond resolution, any provision of the revenue bonds to be issued pursuant to it, the provisions therein made for the security and payment of the revenue bonds, and the validity of all other provisions and proceedings relating to the authorization and issuance of such bonds. After that time, no person may contest the regularity, formality, legality, or effectiveness of the bond resolution, any provisions of the revenue bonds to be issued pursuant to it, the provisions for the security and payment of the revenue bonds, and the validity of all other provisions and proceedings relating to their authorization and issuance, for any cause whatever. Thereafter, it shall be conclusively presumed that the revenue bonds are legal and that every legal requirement for the issuance of the revenue bonds has been complied with. No court shall have authority to inquire into any of these matters after the thirty days.
(ii) The bond resolution shall authorize the program to be financed and, in addition, may contain provisions which shall be a part of the contract with the holders of such issue of revenue bonds, as to:
(g) Vesting in one or more trustees or fiscal agents such property, rights, powers, and duties in trust as the authority may determine.
[[Image here]]
(iii) All revenue bonds issued pursuant to a bond resolution shall be equally and ratably secured by a pledge, charge, and lien upon revenues provided for in the bond resolution. Any pledge made by the authority pursuant to this Section shall be valid and binding from the time when the pledge is made. The revenues, securities, and other monies so pledged and then held or thereafter received by the authority or any fiduciary shall immediately be subject to the lien of such pledge without any physical delivery thereof or further act, and the lien of any such pledge shall be valid and binding as against all parties *433 having claims of any kind in tort, contract, or otherwise against the authority, whether or not such parties have notice thereof. The bond resolution by which a pledge is created need not be filed or recorded except in the official minutes of the authority and of the State Bond Commission. The revenue bonds shall be of such series, bear such date or dates, be serial or term bonds, mature at such time or times, bear interest at such rate or rates payable on such date or dates, be in such denominations, be in such form, either coupon or fully registered without coupons, carry such registration and exchangeability privilege, be payable in such medium of payment and at such place or places, be subject to such terms of redemption, and be entitled to such priorities on the revenues of the authority as the bond resolution may provide.
(iv) The revenue bonds shall be sold by the authority in such manner and at such prices, at public or private sale, as it may determine. If the authority sells the bonds at public sale, notice of such sale upon sealed proposals shall be published at least once not less than seven days prior to the date of such sale in a publication carrying municipal bond notices and devoted primarily to financial news or to the subject of state and municipal bonds, published in the city of New York, New York, and in a newspaper of general circulation published in the City of New Orleans, Louisiana.
(v) The revenue bonds and coupons attached thereto shall be executed in the name of the authority by the manual or facsimile signatures of such official or officials as may be designated in the bond resolution. If any officer whose manual or facsimile signature appears on any revenue bond or coupon ceases to be such officer before the delivery of such revenue bonds, such signature nevertheless shall be valid and sufficient for all purposes as if he had remained in office until such delivery. The bond resolution may provide for authentication of the revenue bonds by the trustees or fiscal agent thereunder.
(vi) Pending the preparation of definitive revenue bonds, the authority may issue interim receipts or temporary revenue bonds, with or without coupons, exchangeable for definitive revenue bonds when such bonds have been executed and are available for delivery.
(vii) No commissioner or officer of the authority, and no officer or member of the City of New Orleans or its governing body, or any person executing such revenue bonds shall be liable personally on such revenue bonds.
(viii) The authority shall have power to purchase its revenue bonds out of any funds available therefor under the bond resolution. It may hold, cancel, or resell such bonds, subject to and in accordance with agreements with holders of its revenue bonds.
[[Image here]]
| sn(xii) The revenue bonds shall be limited obligations of the authority. The principal of and interest on the revenue bonds shall not be payable from the general funds of the authority nor shall they constitute a pledge, charge, lien, or encumbrance upon any of its property or upon any of its income, receipts, or revenues except the revenues, agreements, and funds pledged under the bond resolution. Neither the credit nor the taxing power of the City of New Orleans or the state of Louisiana shall be pledged for the payment of such principal or interest, and no holder of revenue bonds shall have the right to compel the exercise of the taxing power by the City of New Orleans or the forfeiture of its property in connection *434 with any default thereon. Every revenue bond shall recite in substance that the principal of and interest on such bond is payable solely from the revenues pledged to its payment and the authority is not obligated to pay such principal or interest except from such revenues. The revenue bonds issued under the provisions of this Section shall not constitute a debt of the state of Louisiana or the City of New Orleans, are not subject to any constitutional or statutory debt limitation or statutory debt limitation or restriction and shall not be subject to the provisions of the charter of the City of New Orleans relating to the authorization, issuance, or sale of bonds, and the state of Louisiana shall not be liable thereon.
(xiii) Subject to agreements with the holders of revenue bonds, all proceeds of revenue bonds and all revenue pledged under a bond resolution shall be set aside as received and shall be deposited and held in trust by a trustee appointed by the authority in a fund or funds separate and apart from all other funds of the authority. Subject to the bond resolution, the trustee shall hold the same for the benefit of the holders of the bonds for the application and disposition thereof solely to the respective uses and purposes in such bond resolution.
* * *
Section 11. Bonds as Legal Investment
All banks, trust companies, bankers, savings banks and institutions, building and loan associations, savings and loan associations, investment companies, and other persons carrying on a banking or investment business; all insurance companies, insurance associations, and other persons carrying on an insurance business; and all executors, administrators, curators, trustees, and other fiduciaries, may legally invest any sinking funds, monies, or other funds belonging to them or within their control in any bonds or other obligations issued by the authority pursuant to this Act; but the bonds and other obligations shall be secured by an agreement between the issuer and the- federal government in which the issuer agrees to borrow from the federal government and the federal government agrees to lend to the issuer, prior to the maturity of such bonds or other obligations, monies in any amount which (together with any other monies irrevocably committed to the payment of principal and interest on the bonds or other obligations) will suffice to pay the principal of the bonds or other obligations with interest to maturity thereon, which monies under the terms of said agreement are required to be used for the purpose of paying the principal of and the interest on the bonds or other obligations at their maturity. Bonds and other obligations shall be authorized security for all public deposits. It is the purpose of this Section to authorize any persons, political subdivisions, and officers, public or private, to use any funds owned or controlled by them for the purchase of any such bonds or other obligations. Nothing contained in this Section with regard to legal investments shall be construed as relieving any persons of any duty of exercising reasonable care in selecting securities.
Section 12. Property Exempt from Taxes and from Levy and Sale by Virtue of an Execution
(a) All property of the authority, including funds owned or held by it for the purpose of this Act, shall be exempt from levy and sale by virtue of an execution, and no execution or other judicial process shall issue against the same nor shall judgment against 'the authority be a charge or hen upon such property; but the provisions of this Section shall not apply to or limit the *435 right of obligees to pursue any remedies for the enforcement of any pledge or lien given pursuant to this Act by the authority on its rents, fees, grants, or revenues from community improvement projects; further, the provisions of this Section shall not apply to or limit the right of an obligee to foreclose or otherwise enforce the terms and provisions of any mortgage, note, or other security given by the authority in connection with any immovable property owned by it.
(b) The property of the authority acquired or held for the purposes of this Act is declared to be public property used for essential public and governmental purposes and such property shall be exempt from all taxes of the municipality, the parish, the state, or any political subdivision thereof or any other taxing body; but such tax exemption shall terminate when the |31 authority sells, leases, or otherwise disposes of the property in a community improvement area to a purchaser or lessee which is not a public body entitled to tax exemption with respect to the property; however, when any property or portion thereof reenters commerce while owned by the authority or any other public body, the tax exemption herein provided for shall cease as long as such property or portion thereof is used in commerce.
Section 13. Cooperation by Public Bodies with the New Orleans Redevelopment Authority
(a) For the purpose of aiding in the planning, under- taking, or carrying out of a community improvement project and related activities authorized by this Act, any public body may, upon such terms, with or without consideration as it may determine:
(1) Dedicate, sell, donate, grant, devise, convey, or lease any of its interest in any property or grant easements, licenses, or other rights or privileges therein to the authority.
* * *
(4) Lend, grant, or contribute funds to the authority and borrow money and apply for and accept advances, loans, grants, contributions, and any other form of financial assistance from the federal government, the state, parish, or other public body, or from any other source.
[[Image here]]
(6) Cause public buildings and public facilities, including parks, playgrounds, recreational, community, educational, water, sewer, or drainage facilities, or any works which it is otherwise empowered to undertake to be furnished; furnish, dedicate, close, vacate, pave, install, grade, regrade, plan or replan streets, roads, sidewalks, ways, or other places; plan or replan, zone or rezone any property of the public body, or make exceptions from building regulations; and cause administrative and other services to be furnished to the authority.
If at any time title to or possession of any community improvement project is held by any public body or governmental agency, other than the authority which is authorized by this Act to engage in the undertaking, carrying out, or administration of community improvement projects and related activities, the provisions of the agreements referred to in this Section shall inure to the benefit of and may be enforced by such public body or governmental agency.
[[Image here]]
(c) For the purposes of aiding in the planning, undertaking, or carrying out of any community improvement project and related activities of the New Orleans Redevelopment Authority, the City of New Orleans may (in addition to its other powers and upon such terms, with or without consideration, as it may determine) do and *436 perform any or all of the actions or things which, by the provisions of Subsection (a) of this Section, a public body is authorized to do or perform, including the furnishing of financial and other assistance.
* Hs *
Section 14. Title of Purchase Any instrument executed by the authority purporting to convey any right, title, or interest in any property under this Act shall be conclusively presumed to have been executed in compliance with the provisions of this Act insofar as title or other interest of any bona fide purchaser, lessees, or transferees o/the property is concerned.
Section 15. Agencies to Have No Power of Taxation
The New Orleans Redevelopment Authority created by this Act shall not have any power to levy or assess any ad valo-rem taxes, personal property taxes, or any other forms of taxes, including special assessments against any property.
* * *
Section 20. Definitions
The following terms whenever used or referred to in this Act shall have the following meaning unless a different meaning is clearly indicated in the context:
(a) “Authority” or “New Orleans Redevelopment Authority” means the public agency created by Section 5 of this Act.
* * *
(j) “Community Improvement Project” means undertakings and activities for the elimination and for the prevention of the development or spread of slums and blight and may involve slum clearance and redevelopment in a community improvement area, or rehabilitation or conservation in a community improvement area, or a program of code enforcement in a community improvement area, and may include open land which, because of its location and/or situation, is necessary for sound community growth which is to be developed by replatting and planning, or any combination or part thereof in accordance with a community improvement plan. Such undertakings and activities may include:
132* * *
(11) Relocating within the project area a structure which the authority determines to be of historic value and which will be disposed of to a public body or private nonprofit organization which will renovate and maintain such structure for historic purposes.
* * *
Section 2. This Act shall become effective upon signature by the governor or, if not signed by the governor, upon expiration of the time for bills to become law with- out signature by the governor, as provided by Article III, Section 18 of the Constitution of Louisiana. If vetoed by the governor and subsequently approved by the legislature, this Act shall become effective on the day following such approval.
Approved by the Governor, July 7, 1994.
APPENDIX C
ImACT No. 299
House Bill No. 1089. By: Messrs. T.A. Casey and Le-Breton.
AN ACT
To amend and reenact Subsection 1 of Section 20 of Act 170 of the 1968 Regular Session, entitled An act to authorize, by local option, the formulation of a program by the city of New Orleans for the utilization of appropriate private and public resources to eliminate and prevent the development or spread of slums; to provide decent, safe and sanitary dwellings for families of low income; to allow the creation and organization of a Community Improvement *437 Agency; to allow the rehabilitation, clearance and redevelopment of slums and blighted areas in the city of New Orleans in accordance with community improvement plans or projects approved by the governing body of the city of New Orleans; to define the duties, liabilities, exemptions, authority and functions of such community improvement agency, including the acquisition of property by negotiation, gift or expropriation, the disposition of property by sale or lease, the issuance of bonds, borrowing of money and giving of security therefor and to allow bonds issued to be legal investments for banks and fiduciaries; to provide for notice and hearing; to authorize entering into agreements to secure federal aid; to authorize public bodies to furnish funds, services, facilities, and property in aid of community improvement projects and related activities hereunder; and to provide that securities issued and properties while held by the Community Improvement Agency shall be exempt from taxation, to change the definition of community improvement plan.
Notice of intention to apply for the passage of this Act has been published and evidence of such publication exhibited to the legislature, both as provided by Section 6 of Article IV of the Constitution of Louisiana.
BE IT ENACTED BY THE LEGISLATURE OF LOUISIANA
Section 1. Subsection 1 of Section 20 of Act 170 of the 1968 Regular Session of the legislature, is hereby amended and reenacted to read as follows:
(1) Community improvement plan means a general plan, as it exists from time to time for a community improvement project, which plan (1) shall conform to the general plan for the municipality as a whole except as provided in Sub- section 7(e), and (2) shall delineate the community improvement area affected thereby. It shall be sufficient for the plan, for each community improvement area, to contain a general description of those matters proposed to be carried out in the community improvement area, such as any or all of the following: land acquisitions, demolition and removal of structures, redevelopment, improvements, rehabilitation, zoning and planning changes if any, land uses, population densities, or building requirements. Detailed, particularized proposals for the implementation of all or any portion of a Community improvement plan heretofore or hereafter approved by the electorate shall not be deemed a redevelopment pan or project for the purposes of Subsection 7(c) of this Act, but shall be deemed modifications of the plan, approval of which is required pursuant to Subsection 7(d) of this Act. The foregoing definition, as herein amended, shall apply to any community improvement plan heretofore or hereafter approved pursuant to Section 7 of this Act.
Section 2. All laws or parts of laws in conflict herewith are hereby repealed.
APPENDIX D
UACT No. 571
House Bill No. 742. By: Messrs. Connor, Charbonnet, Gee, J. Jackson, Watermeier, Alexander, Byrnes, Johnson and Senators Casey, Hickey, Braden, Kiefer, O’Keefe and Windhorst and Mr. Heaton.
AN ACT
To amend Act 170 of the 1968 Regular Session of the Louisiana Legislature, designated as the “New Orleans Community Improvement Act”, by adding thereto a new Section to be designated Section 10.1, to grant additional powers to the Community Improvement Agency in and for the city of New Orleans in order to permit it to establish programs *438 for residential development, including low interest rate home mortgage loan programs for qualified persons, and to finance, through the issuance of revenue bonds, the cost of such programs, and otherwise to provide with respect thereto.
Notice of intention to introduce this Act has been published as provided by Arti- . ele III, Section 13 of. the Constitution of Louisiana.
Be it enacted by the Legislature of Louisiana:
Section 1. Section 10.1 of Act 170 of the 1968 Regular Session of the Louisiana Legislature is hereby enacted to read as follows:
Section 10.1. Definitions, home loans, bonds, powers, restrictions, presumptions
(a) For the purpose of this Section unless the context clearly otherwise requires, the following definitions shall apply and be equally applicable to both the singular and plural forms of any' of the defined terms:
‘ (1) “Agency” means the Community Improvement Agency in and for the city of New Orleans created pursuant to this Act.
(2) “Bond resolution” means a resolution authorizing the issuance of revenue bonds pursuant to this Section.
(3) “Development costs” means and includes the sum total of all reasonable or necessary costs incidental to the acquisition, construction, reconstruction, rehabilitation, repair, alteration, improvement and extension of a residential development, including, without limitation, the following: the cost of studies and surveys; plans and specifications; architectural and engineering services; underwriting fees; legal, accounting, marketing and other special services relating to residential development or incurred in connection with the issuance and sale of bonds; necessary application and other fees to federal, state, and local government agencies for any requisite approvals for construction, for assisted financing or otherwise; financing, acquisition, demolition, construction, equipment, and site development of new and rehabilitated buildings; the relocation of utilities, public ways and parks; the construction of recreational, cultural, and commercial facilities; rehabilitation, reconstruction, repair or remodeling of existing buildings and all other necessary and incidental expenses, including trustee and rating agency fees and an initial bond and interest reserve together with interest on bonds issued to finance a residential development to a date six months subsequent to the estimated date of completion; any premiums for mortgage insurance or insurance with respect to bonds, and such other expenses as the agency may deem appropriate to effectuate the purposes of this Section and this Act.
(4) “Home” means real property and improvements thereon located within a community improvement or community development area in the city of New Orleans, Louisiana, which may consist of single or multiple dwelling units, or condominium units, owned by one who occupies one of such units, provided however newly constructed multiple dwelling units shall not exceed four units.
(5) “Home mortgage” means an interest bearing loan to a mortgagor for the purpose of purchasing or rehabilitating, reconstructing, or improving a home, evidenced by a promissory note and secured by a mortgage on such home, but shall not include a loan primarily for the purpose of refinancing an existing loan.
(6) “Lending institution” means any bank, trust company, savings bank, national banking association, savings and loan association, building and loan association, *439 government approved nonprofit lending institutions, mortgage banker, housing development corporations, or other financial institution, or governmental agency which customarily provides service or otherwise aids in the financing of mortgages on single family residential housing or multifamily residential housing located in the city of New Orleans, Louisiana, or any holding company for any of the foregoing.
(7) “Mortgage program” means any program established under this Section to provide low income loans, the proceeds of which will be used to purchase, rehabilitate, or improve homes.
|3s(8) “Mortgagor” means a person or persons whose adjusted gross aggregate income, together with the adjusted gross aggregate income of all persons who intend to reside with such person or persons in one dwelling unit, shall not have exceeded forty thousand dollars (or such lesser amount or amounts as shall be deemed by the agency to be in furtherance of its public purposes) for the immediately preceding taxable year and who has received a home mortgage on a home.
(9)“Residential development” means the acquisition, construction, reconstruction, rehabilitation, repair, alteration, improvement or extension of any land, interest in land, building, structure, facility, system, fixture, improvement, addition, appurtenance, machinery, or equipment or any combination thereof, all real and personal property deemed necessary in connection therewith, and all real and personal property or improvements functionally related and subordinate thereto, substantially for use by or occupied by persons for the purpose of decent, safe, and sanitary housing, and in connection therewith non-housing facilities which are an integral part of or functionally related to such residential development not to exceed 10% of the cost of such residential development in accordance with the terms contained in this Act. Any such residential development shall be located within a community .improvement area.
(10) “Revenue bonds” means any bonds issued pursuant to this Section.
(b) The agency is authorized and empowered to establish programs for residential development, including but not limited to low interest rate home mortgage programs for qualified persons, by issuing mortgage revenue bonds to provide funds to persons to enable them to purchase or to rehabilitate, reconstruct, or improve single or multiple unit owner-occupied or rental family residences in community improvement or community development areas. In order to accomplish such purpose, the agency shall have and is hereby granted the following powers which shall be in addition to all other powers which it may have under this Act or general law:
(1) Residential development
To plan, conduct research, study, develop, and promote the establishment of residential housing.
(2) Home mortgages
(i) To acquire, contract, and enter into advance commitments to acquire home mortgages owned by lending institutions at such purchase prices and upon other terms and conditions as shall be determined by the agency or such other person as it may designate as its agent, to make and execute contracts with nonprofit housing development corporations and lending institutions for the origination and servicing of home mortgages and to pay the reasonable value of services rendered under those contracts.
(11) To make loans to government approved nonprofit lending institutions and lending institutions under terms and conditions which, in addition to other provisions *440 as determined by the agency, shall require the lending institutions to use substantially all of the net proceeds thereof, directly or indirectly, for the making of home mortgages in an aggregate principal amount substantially equal to the amount of such net proceeds.
(iii) To establish, by rules or regulations, in resolutions relating to any issuance of revenue bonds or in any financing documents relating to such issuance, such standards and requirements applicable to the purchase of home mortgages or the making of loans to lending institutions as the agency deems necessary or desirable, including, but not limited to: (a) the location and other characteristics of homes to be financed by home mortgages; (b) the terms and conditions of home mortgages to be acquired; (c) the amounts and types of insurance coverage required on homes, home mortgages, and revenue bonds; (d) the representations and warranties of lending institutions confirming compliance with such standards and requirements; (e) restriction as to interest rate or other terms of home mortgages or the return realized therefrom by lending institutions; (f) any other matters related to the purchase of home mortgages or the making-of loans to lending institutions as shall be deemed relevant by the agency; provided, however, that in no such case shall any such lending institution charge and retain an origination fee in excess of three percent of the principal amount of any such home mortgage; and further provided that all such home mortgages shall bear a stated interest rate which, as of the business day immediately preceding the date of execution of a contract for the sale of the related revenue bonds, is (1) at least one and a half percent less than the stated interest rate being charged as of such day by such lending institution for its ninety-five percent loan-to-value mortgage loans (computed on a weighted average basis if such lending institution has more than one such rate) or (2) if such lending institution does not regularly offer ninety-five percent loan-to-value mortgage loans, at least one percent less than the stated interest rate being charged as of such day by such lending institution for its eighty percent loan-to-value mortgage loans (computed on a weighted average basis if such lending institution has more than one such rate).
(iv) To require from each lending institution from which home mortgages are pm-chased or to which loans are made the submission, at the time of such purchase or loan, of evidence satisfactory to the agency of the ability and intention of such lending institution to make home mortgages, and the submission, within the time specified by the agency for making | ^disbursements for home mortgages, of evidence satisfactory to the agency of the making of home mortgages and of compliance with any standards and requirements established by the agency; in connection therewith, the agency may inspect the books and records of such lending institutions.
(3) Financing of purchases or funding the making of mortgages for residential developments.
(i) To issue revenue bonds to defray, in whole or in part, the development costs of any residential development; to issue its revenue bonds to defray, in whole or in part, the costs of purchasing, or funding the making of, mortgages for residential developments including, but not limited to, the costs of studies and surveys, insurance premiums, underwriting fees, legal, accounting and marketing services incurred in connection with the issuance and sale of such revenue bonds, including bond and interest reserve accounts and trustee, custodian and rating agency fees; and to des *441 ignate appropriate names for such bonds. The agency need not acquire or hold title to or any interest in a residential development or home mortgage.
(ii) To rent, lease, sell, or otherwise dispose of any residential development or home mortgages, in whole or in part, or to loan sufficient funds to any lending institution to defray, in whole or in part, the development costs of any residential development or the costs of purchasing home mortgages, so that the rents or other revenues to be derived with respect to the residential development or home mortgages, together with any insurance proceeds, reserve accounts and earnings thereon shall be designed to produce revenues and receipts at least sufficient to provide for the prompt payment at maturity of principal, interest, and redemption premium, if any, upon all revenue bonds issued to finance such costs.
(iii) To pledge any revenues and receipts to be received from any residential development or home mortgages to the punctual payment of revenue bonds and the interest and redemption premiums, if any, thereof.
(iv) To mortgage, pledge, or grant security interests in any residential development, home mortgages, notes, or other property In favor of the holder or holders of revenue bonds issued therefor.
(v) To sell and convey any residential development or home mortgages, including, without limitation, the sale and conveyance thereof subject to a mortgage, pledge, or security interest, if any, as provided in the resolution or ordinance relating to the issuance of the revenue bonds for such prices and at such times as the governing body of the agency may determine.
(vi) To issue its revenue bonds in accordance with this Section to refund in whole or in part at any time revenue bonds theretofore issued by the agency under authority of this Section.
(vii) To apply for and accept on its own behalf or on behalf of any person, advances, loans, grants, contributions, guarantees, rent supplements, mortgage assistance, and any other form of financial assistance from the federal government, the state of Louisiana, any parish or municipality, or any other public or quasi-public body, corporation, or foundation, or from any other source, public or private, including any lending institution, for any of the purposes of this Act, and to include in any contract for financial assistance such conditions as it may deem reasonable and appropriate and which are not inconsistent with the purposes of this Act.
(viii) To make and execute contracts and other instruments necessary or convenient to the exercise of any of the powers granted herein.
(4) Nondiscrimination
No lending institution undertaking transactions contemplated by this Act shall discriminate against any person on the basis of race, color, religion, sex, creed, ancestry, national origin, or physical or mental handicap in connection with such transactions.
(5) Authorization, security, sale and certain other details of revenue bonds •
(i) The agency shall authorize revenue bonds by one or more bond resolutions adopted by a majority of its commissioners. Any bond resolution shall be published one time in the official journal of the city of New Orleans, Louisiana, however, it shall not be necessary to publish any exhibits to such bond resolution if the same are available for public inspection and such *442 fact is stated in the publication. For thirty days after the date of publication, any person in interest may contest the legality of the bond resolution, any provision "of the revenue bonds to be issued pursuant to it, the provisions therein made for the security and payment of the revenue bonds, and the validity of all other provisions and proceedings relating to the authorization and issuance of such bonds. After that time, no person may contest the regularity, formality, legality, or effectiveness of the bond resolution, any provisions of the revenue bonds to be issued pursuant to it, the provisions for the security and payment of the revenue bonds, and the validity of all other provisions and proceedings relating to their authorization and issuance, for any cause whatever. Thereafter, it shall be conclusively presumed that the revenue bonds are legal and that every |a7legal requirement for the issuance of the revenue bonds has been complied with. No court shall have authority to inquire into any of these matters after the thirty days.
(ii) The bond resolution shall authorize the program to be financed and, in addition, may contain provisions which shall be a part of the contract with the holders of such issue of revenue bonds, as to
(a) pledging all or any part of revenues received or to be received, and agreements to secure the payment of such issue of revenue bonds;
(b) rates, fees, rentals, or other charges to be established, maintained, and collected, and the use and disposition of revenues, gifts, and funds received or to be received;
(c) the setting aside of reserves or bond retirement funds and the regulation and disposition thereof;
(d) the custody, collection, securing, investment, and payment of any moneys held in trust or otherwise for the payment of revenue bonds or in any way to secure the payment of revenue bonds, including the establishment and maintenance of revenue, reserve, or other funds as trust funds;
(e) Limitations or restrictions on the purposes to which the proceeds of sale of any revenue bonds then or thereafter to be issued may be applied;
(f) limitations or restrictions on the issuance of additional revenue bonds; the ■ terms upon which additional revenue bonds may be issued and secured, or the refunding of outstanding or other revenue bonds, or both;
(g) vesting in one or more trustees or fiscal agents such property, rights, powers, and duties in trust as the agency may determine;
(h) the acquisition and disposition of property;
(i) the rights and remedies available to the bondholders in the event of default;
(j) provisions for insurance and for accounting reports and the inspection and audit thereof;
(k) the replacement of mutilated, destroyed, stolen, or lost revenue bonds; and
(l) any other matters of like or different character which in any way affect the security or protection of the revenue bonds.
(iii) All revenue bonds issued pursuant to a bond resolution shall be equally and ratably secured by a pledge, charge, and lien upon revenues provided for in the bond resolution. Any pledge made by the agency pursuant to this Section shall be valid and binding from the time when the pledge is made. The revenues, securities, and other moneys so pledged and then held or thereafter received by the agency or any fiduciary shall immediately be subject to the lien of such pledge without any *443 physical delivery thereof or further act, and the lien of any such pledge shall be valid and binding as against all parties having claims of any kind in tort, contract, or otherwise against the agency, whether or not such parties have notice thereof. The bond resolution by which a pledge is created need not be filed or recorded except in the official minutes of the agency and of the State Bond Commission. The revenue bonds shall be of such series, bear such date or dates, be serial or term bonds, mature at such time or times, bear interest at such rate or rates payable on such date or dates, be in such denominations, be in such form, either coupon or fully registered without coupons, carry such registration and exchangeability privilege, be payable in such medium of payment and at such place or places, be subject to such terms of redemption, and be entitled to such priorities on the revenues of the agency as the bond resolution may provide.
(iv) The revenue bonds shall be sold by the agency in such manner and at such prices, at public or private sale, as it may determine. If the agency determines to sell the bonds at public sale, notice of such sale upon sealed proposals shall be published at least once not less than seven days prior to the date of such sale in a publication carrying municipal bond notices and devoted primarily to financial news or to the subject of state and municipal bonds, published in the city of New York, New York, and in a newspaper of general circulation published in the city of New Orleans, Louisiana.
(v) The revenue bonds and coupons attached thereto shall be executed in the name of the agency by the manual or facsimile signatures of such official or officials as may be designated in the bond resolution. If any officer whose manual or facsimile signature appears on any revenue bond or coupon ceases to be such officer before the delivery of such revenue bonds, such signature nevertheless shall be valid and sufficient for all purposes as if he had remained in office until such delivery. The bond resolution may provide for authentication of the revenue bonds by the trustees or fiscal agent thereunder.
(vi)Pending the preparation of definitive revenue bonds, the agency may issue interim receipts or temporary revenue bonds, with or without coupons, exchangeable for definitive revenue bonds when such bonds have been executed and are available for delivery.
IssCvii) No commissioner or officer of the agency, and no officer or member of the city of New Orleans or its governing body, or any person executing such revenue bonds shall be hable personally on such revenue bonds.
(viii) The agency shall have power to purchase its revenue bonds out of any funds available therefor under the bond resolution. It may hold, cancel, or resell such bonds, subject to and in accordance with agreements with holders of its revenue bonds.
(ix) All revenue bonds and interest coupons appertaining thereto issued pursuant to this Section shall be and are hereby made negotiable instruments within the meaning of and for all the purposes of the negotiable instruments law of Louisiana, subject only to the provisions of the revenue bonds for registration.
(x) All revenue bonds and the income therefrom shall be exempt from all taxation by the state of Louisiana or any political subdivision thereof. The revenue bonds shall be legal and authorized investments for banks, savings banks, insurance companies, homestead and building and loan associations, trustees, and other fidu *444 ciaries and may be used for deposit with any officer, board, municipality, or other political subdivision of the state of Louisiana, in any case where, by present or future laws, deposit or security is required.
(xi) The holders of any revenue bonds issued hereunder shall have such rights and remedies as may be provided in the bond resolution, including, but not by way of limitation, acceleration of payment, appointment of a trustee for bondholders, appointment of a receiver for the redevelopment project or the revenue bond program financed with the proceeds of the revenue bonds or the revenues from such program, or both, and any other available civil action to compel compliance with the terms and provisions of the revenue bonds and the bond resolution.
(xii) The revenue bonds shall be limited obligations of the agency. The principal of and interest on the revenue bonds shall not be payable from the general funds of the agency, nor shall they constitute a pledge, charge, lien, or encumbrance upon any of its property or upon any of its income, receipts, or revenues except the revenues, agreements, and funds; pledged under the bond resolution. Neither the credit nor the taxing power of the city of New Orleans or the state of Louisiana shall be pledged for the payment of such principal or interest, and no holder of revenue bonds shall have the right to compel the exercise of the taxing power by the city of New Orleans or the forfeiture of its property in connection with any default thereon. Every revenue bond shall recite in substance that the principal of and interest on such bond is payable solely from the revenues pledged to its payment and the agency is not obligated to pay such principal or interest except from such revenues. The revenue bonds issued under the provisions of this Section shall not constitute a debt of the state of Louisiana or the city of New Orleans, are not subject to any constitutional or statutory debt limitation or statutory debt limitation or restriction and shall not be subject to the provisions of the charter of the city of New Orleans relating to the authorization, issuance, or sale of bonds, and the state of Louisiana shall not be liable thereon.
(xiii) Subject to agreements with the holders of revenue bonds, all proceeds of revenue bonds and all revenue pledged under a bond resolution shall be set aside as received and shall be deposited and held in trust by a trustee appointed by the agency in a fund or funds separate and apart from all other funds of the agency. Subject to the bond resolution, the trustee shall hold the same for the benefit of the holders of the bonds for the application and disposition thereof solely to the respective uses and purposes in such bond resolution.
Section 2. If any provision or item of this Act or the application thereof is held invalid, such invalidity shall not affect other provisions, items, or applications of this Act which can be given effect without the invalid provisions, item, or applications, and to this end the provisions of this Act are hereby declared severable.
Section 3. Insofar as the provisions of this Act are inconsistent with the provisions of any other general, special, or local law, the provisions of this Act shall be controlling.
Section 4. This Act shall become effective upon signature by the governor or, if not signed by the governor, upon expiration of the time for bills to become law without signature by the governor, as provided by Article III, Section 18 of the Louisiana Constitution of 1974.
Approved by the Governor: July 23, 1980.
*445 APPENDIX E
ImACT No. 572
House Bill No. 743. By: Messrs. Connor, Charbonnet, Gee, J. Jackson, Watermeir, Alexander, Byrnes and Johnson and Senators Casey, Hickey, Braden, Kiefer, O’Keefe and Windhorst.
AN ACT
To amend and reenact Subsection (g) of Section 10 and Subsection (a) of Section 12 of Act 170 of the 1968 Regular Session of the Louisiana Legislature, designated as the “New Orleans Community Improvement Act” to permit a mortgagee of immovable property owned by the Community Improvement Agency in and for the city of New Orleans to enforce said mortgage through executory process; to permit the Community Improvement Agency in and for the city of New Orleans to sell bonds at private or public sale in a manner to be determined by the board of commissioners; and to otherwise provide with respect thereto.
Notice of intention to apply for the passage of this Act has been published and evidence of such publication exhibited to the legislature, both as required by Article III, Section 13 of the Louisiana Constitution of 1974.
Be it enacted by the Legislature of Louisiana:
Section 1. Subsection (a) of Section 12 of Act 170 of the 1968 Regular Session of the Louisiana Legislature is hereby amended and reenacted to read as follows:
Section 12. Property Exempt from Taxes and from Levy and Sale by Virtue of an Execution
(a) All property of the agency, including funds owned or held by it for the purpose of this Act, shall be exempt from levy and sale by virtue of an execution, and no execution or other judicial process shall issue against the same nor shall judgment against the agency be a charge or lien upon such property; but the provisions of this Section shall not apply to or limit the right of obligees to pursue any remedies for the enforcement of any pledge or lien given pursuant to this Act by the agency on its rents, fees, grants, or revenues from community improvement projects; further the provisions of this Section shall not apply to or limit the right of an obligee to foreclose or otherwise enforce the terms and provisions of any mortgage, note or other security given by the agency in connection with any immovable property owned by it.
* :|: *
Section 2. Subsection (g) of Section 10 of Act 170 of the 1968 Regular Session of the Louisiana Legislature is hereby amended and reenacted to read as follows:
Section 10. Issuance of Bonds
(g) The bonds of the Community Improvement Agency may be sold at public or private sale in such manner and from time to time as may be determined by the board of commissioners to be most advantageous.
Section 3. If any provision or item of this Act or the application thereof is held invalid, such invalidity shall not affect other provisions, items, or applications of this Act which can be given effect without the invalid provisions, items, or applications, and to this end the provisions of this Act are hereby declared severable.
Section 4. Insofar as the provisions of this Act are inconsistent with the provisions of any other general, special, or local law, the provisions of this Act shall be controlling.
Section 5. This Act shall become effective upon signature by the governor or, if not signed by the governor, upon expira *446 tion of the time for bills to become law without signature by the governor, as provided by Article III, Section 18 of the Louisiana Constitution of 1974.
Approved by the Governor: July 23, 1980.
APPENDIX F
UnACT No. 155
House Bill No. 309. By: Messrs. Johnson, Heaton, J. Jackson, C.R. Jones and Miss Landrieu.
AN ACT
To enact Section 8.1 of Act No. 170 of the 1968 Regular Session relative to the Community Improvement Agency of the city of New Orleans, to authorize and provide for said agency to acquire and to dispose of blighted properties on a citywide basis, including procedures for expropriation of such properties, to define terms, and otherwise to provide with respect thereto.
Notice of f intention to introduce this Act has been published as provided by Article III, Section 13 of the Constitution of Louisiana.
Be it enacted by the Legislature of Louisiana:
Section 1. Section 8.1 of Act 170 of the 1968 Regular Session is hereby enacted to read as follows:
Section 8.1. Blighted property removal
A.Notwithstanding any other provision of this Act, the Community Improvement Agency shall have the power to acquire by purchase, gift, bequest, expropriation, negotiation, or otherwise, any blighted property as defined in this Section, either within or outside a designated community improvement area and, further, to hold, clear, manage, and dispose of said property, all in accordance with the procedures set forth herein, which procedures shall be exclusive for the acquisition of individual blighted property by the agency.
B. For the purposes of this Section, “blighted property” shall include those premises which have been declared vacant, uninhabitable, and hazardous by the Department of Safety and Permits of the city of New Orleans. In determining whether any premises are vacant, uninhabitable, or hazardous, the Department of Safety and Permits shall consider the following:
(1) Any premises which because of physical condition are considered hazardous to persons or property;
(2) Any premises declared to be a public nuisance; (3) Any premises declared to be a fire hazard; or
(4) Any premises declared to be vermin infested or lacking in facilities or equipment required by the housing code of the city of New Orleans.
C. The Community Improvement Agency shall not acquire any blighted property by expropriation unless such property has been resolved to be blighted by the local governing authority and the local governing authority has authorized the acquisition of such property by the agency.
D. The procedure for certification of blighted properties shall be as follows:
(1) The Department of Safety and Permits shall submit to the city planning commission and the Community Improvement Agency a list of those properties which are determined to be vacant, uninhabitable, and hazardous and which otherwise meet the criteria set forth in Subsection B herein for the determination of blight.
(2) Within forty-five days after receipt of the list from the Department of Safety and Permits, the city planning commission shall review such list and, in accordance *447 with the comprehensive plan, the code of the city of New Orleans, and any applicable provisions of this Act, shall approve or reject the proposed future use of the individual properties contained therein. The city planning commission shall prepare a list of all properties for which the proposed future use is approved and shall recommend such properties for certification of blight and acquisition to the local governing authority.
(3) The city planning commission shall transmit the list of those properties which are being recommended for a determination of blight and acquisition by the Community Improvement Agency to the local governing authority, the Department of Safety and Permits, and the Community Improvement Agency and shall request that the local governing authority place these properties on its agenda after giving notice to the owner or one of the owners by registered or certified mail at his last known address. If no last known address is available, notice shall be given in the official journal of the municipality. The notice shall include a listing of each property and the respective owner or owners and shall state the date, time, and place of a hearing to determine whether said properties are in fact blighted and whether acquisition thereof by the Community Improvement Agency is necessary. Notice by mail or publication must be accomplished at least thirty days prior to the date of such hearing.
(4) On the date of the hearing, a member of the Department of Safety and Permits, the city planning commission, and the Community Improvement Agency shall appear before thel41local governing authority and present testimony as requested concerning the properties under consideration.
After hearing all of the information and evidence presented, the local governing authority shall certify by resolution those properties which are determined to be blighted and shall authorize the Community Improvement Agency to acquire said properties if the agency finds that such acquisition is necessary and feasible.
E.(l) Upon receipt of authorization to acquire, the Community Improvement Agency shall begin immediately to procure purchasers for any properties acquired pursuant to this Section in order to facilitate the immediate transfer and development thereof.
(2) The Community Improvement Agency shall not acquire any property unless an after-acquired purchase contract has been entered into between the agency and the prospective purchaser for the immediate transfer of the property to the prospective purchaser.
(3) Prior to acquisition of any properties declared blighted and in accordance with procedures established by the Community Improvement Agency such agency shall offer technical or financial assistance as may be available for rehabilitation to the property owner.
(4) Except to the extent of any conflict with the provisions of this Section, property disposed of within a community improvement area shall be disposed of under a redevelopment contract in accordance with the provisions of Section 9 of this Act. Property disposed of outside a community improvement area shall be disposed of by deed in accordance with the provisions set forth in applicable law.
F. The Community Improvement Agency may receive and utilize any federal, state, local, or other funds as may be appropriated or otherwise made available *448 in order to effectuate the purpose of this Section.
APPENDIX G
I49.ACT No. 375
HOUSE BILL NO. 2176
BY REPRESENTATIVES MURRAY AND HEATON
AN ACT
To amend and reenact Section 8.1(B) (introductory paragraph) of Act No. 155 of the 1984 Regular Session of the Louisiana Legislature, as amended by Act Nos. 65 and 135 of the 1994 Third Extraordinary Session, relative to blighted property in the city of New Orleans; to provide relative to the definition of such property; and to provide for related matters.
Notice of intention to introduce this Act has been published as provided by Article III, Section 13 of the Constitution of Louisiana.
Be it enacted by the Legislature of Louisiana:
Section 1. Section 8.1(B) (introductory paragraph) of Act No. 155 of the 1984 Regular Session of the Louisiana Legislature, as amended by Act Nos. 65 and 135 of the 1994 Third Extraordinary Session, is hereby amended and reenacted to read as follows:
Section 8.1. Blighted property removal * * *
B. For the purposes of this Section, “blighted property” shall include those commercial or residential premises, including lots, which have been declared vacant, uninhabitable, and hazardous by the Department of Safety and Permits of the city of New Orleans. In determining whether any premises are vacant, uninhabitable, or hazardous, the Department of Safety and Permits shall consider the following:
[[Image here]]
Approved by the Governor, June 16,-1995.
Published in the Official Journal of the State:
July 14,1995
A true copy:
W. Fox McKeithen
Secretary of State
APPENDIX H
140ACT No. 101
SENATE BILL NO. 1367 BY SENATORS BAGNERIS AND JOHNSON AND REPRESENTATIVE MURRAY
AN ACT
To amend and reenact Section 8.1(8) (introductory paragraph), (C), and (D) of Act No. 170 of the 1968 Regular Session, as enacted by Act No. 155 of the 1984 Regular Session and amended by Act No. 135 of the 1994 Third Extraordinary, Session and Act No. 375 of the 1995 Regular Session, relative to the New Orleans Redevelopment Authority; to provide relative to the identification of property which is blighted and subject to acquisition by the authority; and to provide for related matters.
Notice of intention to introduce this Act has been published.
Be it enacted by the Legislature of Louisiana:
Section 1. Section 8.1(B) (introductory paragraph), (C), and (D) of Act No. 170 of the 1968 Regular Session, as enacted by Act No. 155 of the 1984 Regular Session and amended by Act No. 135 of the 1994 Third Extraordinary Session and Act No. 375 of the 1995 Regular Session, are here *449 by amended and reenacted to read as follows:
Section 8.1. Blighted property removal
[[Image here]]
B. For the purposes of this Section, “blighted property” shall include those commercial or residential premises, including lots, which have been declared vacant, uninhabitable, and hazardous by an administrative hearing officer acting pursuant to RS. 13:2575 and 2576 or other applicable law. In determining whether any premises are vacant, uninhabitable, or hazardous, the hearing officer shall consider the following:
[[Image here]]
C. The authority shall not acquire any blighted property by expropriation unless an administrative hearing officer has held an administrative hearing on the Question and has resolved such property to be blighted and has authorized the acquisition of such property by the authority.
D. The procedure for certification of blighted properties shall be as follows:
(1) Any municipal entity responsible for inspecting property and enforcing health, housing, fire, historic district, and environmental codes, which may include the Department of Safety and Permits, the New Orleans Division of Housing and Neighborhood Development, or any other entity designated by the local governing authority shall submit to the administrative hearing officer a list of those properties which are determined to be vacant, uninhabitable, and hazardous and which otherwise meet the criteria set forth in Subsection B herein for the determination of blight.
(2) The administrative hearing officer shall place each listed property on the administrative hearing docket and notify each property owner of the scheduled hearing by registered or certified mail at the property owner’s last known address. If no last known address is avail- able, notice shall be given in the official journal of the municipality. The notice shall include the property owner’s name, the property’s street address, and the date, time, and place of the hearing. The notice shall also state that the purpose of the hearing is to determine whether the property is blighted and eligible for expropriation by the authority. Notice by mail or publication must be accomplished at least thirty days prior to the date of such hearing.
(3)On the date of the hearing, interested parties may present testimony before the hearing officer concerning the properties under consideration. After hearing all of the information and evidence presented, the hearing officer shall certify by order those properties which are determined to be blighted and shall authorize the authority to acquire said properties if the authority finds that such acquisition is necessary and feasible.
[[Image here]]
Section 2. This Act shall become effective upon signature by the governor or, if not signed by the governor, upon expiration of the time for bills to become l^law without signature by the governor, as provided in Article III, Section 18 of the Constitution of Louisiana. If vetoed by the governor and subsequently approved by the legislature, this Act shall become effective on the day following such approval.
Approved by the Governor, June 11, 1997.

. The Third Extraordinary Session of the 1994 Legislature also enacted Act 1994, No. 65, which was repealed by Act 1995, No. 30. Since neither of the acts is law or relevant any longer, we do not attach copies of them as appendices.

. We have attached copies of the various acts to this opinion for future reference by the public and courts because the acts have not been incorporated into the Louisiana Revised Statutes.

. Only the portion of the judgment relating to the trial court’s order directed to the City is at issue in this appeal.